**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

F I L E D

JAN 3 2000

Phil Lombardi, Clerk
U.S. DISTRICT COURT

| | | |
|---|---|---|
| JOLENE SMITH and | ) | |
| JAN PRAWDZIK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 98 CV 0843 H(J) |
| | ) | |
| MORRISON KNUDSEN CORP. | ) | |
| and SECOR INTERNATIONAL, | ) | |
| INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT MORRISON KNUDSEN'S MOTION IN LIMINE TO EXCLUDE PLAINTIFFS' EXPERT WITNESS ON ALLEGED LOST INCOME AND BRIEF IN SUPPORT

COMES NOW Defendant, Morrison Knudsen Corporation ("MK"), by and through its undersigned attorneys of record, and respectfully requests this Court to exclude from evidence the testimony, both oral and written, of the Plaintiffs' expert witness on the lost back wages and lost future income allegedly suffered by the Plaintiffs. Counsel for MK has conferred with counsel for Plaintiffs in an effort to resolve the dispute without court intervention. However, the parties were unable to reach a mutual agreement satisfactory to both sides. The Plaintiffs maintain their objection to this Motion. In support of its Motion, MK offers the following legal brief.

### I. INTRODUCTION

Plaintiff Jolene Smith ("Smith") has alleged that MK discriminated against her in violation of Title VII of the Civil Rights Act of 1964 and tortiously interfered with her employment relationship with SECOR International, Inc. ("SECOR"). Plaintiff Jan Prawdzik ("Prawdzik") has alleged that MK tortiously interfered with his employment relationship with





SECOR.  In response, MK has affirmed that neither Plaintiff was employed by MK, that MK did not discriminate against Smith, and that MK played absolutely no part in SECOR's decision to terminate the Plaintiffs.  SECOR has responded to the Plaintiffs' allegations by affirming that it terminated Smith for violating safety regulations and terminated Prawdzik for poor performance as supervisor of the Tar Creek Cleanup Site.  The Plaintiffs claim they are owed lost back wages and lost future income.  They intend to call Gary Barnes ("Barnes") as an expert to testify as to the amount of their damages.  However, Barnes' testimony should be excluded for several reasons.  First, Barnes is not an expert on lost income.  Second, the theory forming the basis of Barnes' testimony does not meet the *Daubert* standard for reliability.  Third, Barnes' testimony will not assist the trier of fact in determining the amount, if any, of lost income.  Fourth, determining the amount of lost income, if any, is much too speculative in this case.  Fifth, expert testimony regarding lost income is irrelevant in this case because lost future income will not be recoverable.  Sixth, even if testimony regarding lost income is relevant, Barnes' testimony is unduly prejudicial.

## II.    BARNES IS NOT AN EXPERT AS TO THE SUBJECT MATTER OF HIS TESTIMONY

Rule 702 of the Federal Rules of Evidence defines an expert witness as one qualified "by knowledge, skill, experience, training, or education."  While some courts in Oklahoma have allowed  Barnes to testify regarding lost income, MK argues that Barnes is not an expert on lost income. Barnes has no accreditation, has no advanced degree, and is not a member of any professional association whatsoever. *Barnes' Depo*. at 4-5, 8.  His education is limited to an undergraduate degree in accounting. *Barnes' Depo*. at 5.   Barnes has been a practicing accountant for several years, but he is not a Certified Public Accountant. *Barnes' Depo*. at  4. His day-to-day work consists of preparing financial statements for small companies, preparing

their tax returns, reconciling their bank accounts, and running their payroll checks. *Barnes' Depo.* at 4. Thus, Barnes' educational training and work experience is in the area of tax and accounting, not in determining lost income allegedly resulting from termination of employment.

Barnes' extracurricular activities also fail to qualify him as an expert. Barnes has neither taught on the subject nor written any articles on the calculation of lost wages. *Barnes' Depo.* at 7-8. Furthermore, the most basic attribute of one who professes to be an expert in any area, is that he is familiar with the texts considered authoritative in that particular area. Regardless of whether the professed expert agrees with those authoritative texts, he should be familiar with the theories espoused in them. Barnes admits that he is not familiar with the theories contained in authoritative works on lost income because he, admittedly, does not even know what the authoritative sources are. *Barnes' Depo.* at 12-13. He also does not know who any of the local experts are on the issue of lost income. *Barnes' Depo.* at 16. Further, he is not aware of the methods used by experts in the area of lost income, has never heard an expert testify on the issue, has never read an expert's report on the issue, and has never read any publications discussing the methodology for determining lost income. *Barnes' Depo.* at 65-66.

These admissions alone disqualify him as an expert. In addition, Barnes did not perform any analysis for which an expert is required. Barnes admits that all he did was to enter the age, sex, race, and educational attainment of each Plaintiff into the computer software and the computer software calculated each Plaintiff's life expectancy, work life expectancy, the number of years until retirement, and the number of years remaining in the workforce. *Barnes' Depo.* at 13-15, 28-30. Barnes then simply entered what he believed was each Plaintiff's annual decrease in salary because of the termination and entered the "number of years until retirement" (which was generated by the computer software). The computer software then calculated the total lost

future income, and the computer software reduced that amount to its present value.  *Barnes'*
*Depo.* at 13-15, 28-30.

Barnes' testimony should be excluded because it is too simplistic.  In *Blue Dane
Simmental Corp. v. American Simmental Assoc.*, 178 F.3d 1035 (8th Cir. 1999), the Court held
that expert witness testimony must not be overly simplistic.  There, the expert concluded that the
difference in the cattle markets in the U.S. and Canada was due entirely to the presence of
Risinger cattle in the market.  The Court excluded the expert testimony because there was
evidence that several factors contributed to the difference in the two markets, and because the
Risinger cattle constituted less than 1% of the cattle market.

In the present matter, a determination of the amount, if any, of lost income consists of
more than mathematical calculations.  Particularly, the projection of the Plaintiffs' future
working careers requires a broad understanding of the surrounding circumstances and must
include an analysis of several factors.  MK suggests that, in determining expectancies of the
Plaintiffs' future working careers, the trier of fact must consider the plaintiffs' health, education,
opportunity for education, age, intelligence, industriousness, manner of living, sobriety or
temperance, and frugality or lavishness.  The trier of fact should also determine whether the
plaintiffs mitigated their damages.  Finally, the trier of fact should consider the condition of the
labor market, the chance of advancement, and the chance of being laid off.  These are the factors
that the Plaintiffs' witness should address in this case.

However, Barnes admits he is not a vocational expert and has limited knowledge of jobs
in the labor market, the jobs available, or the jobs in demand.  *Barnes' Depo.* at 19.  How can
one with no knowledge of the labor market possibly compute a plaintiff's alleged lost income?

Simply, Barnes is not an expert and offers to the jury no additional expertise above that possessed by any of the lay members of the jury.

### III.   THE BASIS OF THE PROPOSED TESTIMONY IS NOT RELIABLE

The basis for all expert testimony must be reliable.[1]  However, Barnes admittedly has no basis for his professed expertise.  During his deposition, Barnes stated that he was an expert in establishing lost wages.  *Barnes' Depo.* at 7.  Opposing counsel then asked him why he considered himself an expert in establishing lost wages.  In response, Barnes said, "Well, I know how to do it."  *Barnes' Depo.* at 7.  However, Barnes' response begs the question of why he is an expert.

Barnes never goes on to explain ***how*** he knows how to establish lost wages, or ***who*** taught him "how to do it," or ***where*** he learned "how to do it," or ***when*** he learned "how to do it," or ***what*** establishing lost wages consists of, or ***why*** he establishes lost wages the way he does. Barnes did not inadvertently forget to answer these pertinent questions, he failed to answer these basic questions because he was unable to do so.  The entire basis for Barnes' so-called expertise lies in the hope that the jury will just assume, or just take his word for it, that he knows how to establish lost income.  Barnes' failure to explain any of the pertinent questions -- how, who, where, when, what, or why -- demonstrates that he is not qualified to testify as an expert on lost income.

---

[1] See *Kumho Tire Company Ltd. v. Carmichael*, 119 S.Ct. 1167, 1175 (1999).  Whether the methodology used by an expert witness is reliable is based on four factors.  These factors were previously only applied to scientific expert testimony, but in *Kumho* the Court applied them to all expert testimony.  (1) Whether the theory or technique has been or can be tested; (2) Whether the theory or technique has been subjected to peer review and publication; (3) Whether the known or potential rate of error is low and whether there are standards to control the technique's operation; and (4) Whether the theory or technique is generally accepted in the particular scientific community.  See *Id.*

Barnes' method of determining alleged future damages for plaintiffs in general is unreliable because it is riddled with errors. First, the only sources he regularly relies upon in preparing his so-called "report" are a plaintiff's payroll records, before and after the termination. *Barnes' Depo.* at 13. Second, he does not factor in real wage growth. *Barnes' Depo.* at 15. Third, he does not factor in inflation. *Barnes' Depo.* at 15. Fourth, he does not consult any data published by the Bureau of Labor Statistics. *Barnes' Depo.* at 15. Fifth, the "number of years to retirement" and the "number of years remaining in the workforce" is calculated solely by a computer software program, and Barnes is not aware of the factors used by the software program to determine these two figures. Sixth, Barnes could not explain why the computer software yielded different results for the categories "years to retirement" and "years remaining in workforce." *Barnes' Depo.* at 30. Seventh, Barnes could not explain the difference between the two categories "years to retirement" and "years remaining in workforce" or why he calculates a plaintiff's lost future income on "years to retirement" and not "years remaining in workforce." *Barnes' Depo.* at 30.

Not only is Barnes' general method of computation flawed, his computation in the present matter contains additional errors. First, the only correspondence between Plaintiffs' counsel and Barnes before Barnes prepared his so-called "report" was two facsimiles that Barnes received from Plaintiffs' counsel. *Barnes' Depo.* at 17. Second, when asked how he arrived at minimum wage as Smith's hourly rate upon which he computed her interim earnings, Barnes replied that he entered minimum wage because that was the information he received from Plaintiffs' counsel. *Barnes' Depo.* at 39. Third, Barnes factored in the interest rate at 5.2% because that was the prevailing Treasury-Bill rate at the time he prepared his report. He stated that was the only reason he used that particular interest rate and that he had not done any

additional analysis in that regard.  *Barnes' Depo.* at 42.   Fourth, he admitted the computer software he used cannot take into account anything particular to a plaintiff in determining work life expectancy.  *Barnes' Depo.* at 42.   Fifth, he assumed that Smith would have worked for 29 continuous years at minimum wage.  *Barnes' Depo.* at 47-48.   Sixth, he had no explanation for including overtime hours in Smith's interim earnings but not in projecting her future income. *Barnes' Depo.* at 49-50.   Finally, he had no explanation for failing to include fringe benefits in his projection of Smith's future income.  *Barnes' Depo.* at 51.

Thus, Barnes' general method for computation is flawed as are his computations in the present matter.   Furthermore, Barnes' computations in this case are inconsistent.   On one hand, he based Smith's future earnings on a wage rate below what she was earning when her employment was terminated.   However, he based Prawdzik's future earnings on his ending, and highest salary.  *Barnes' Depo.* at 57.   (From counsel's experience, experts on lost wages usually average a plaintiff's wages over the last five years.)   With respect to the Plaintiffs' employer-provided benefits, Barnes attributed $4,800 in benefits or premiums to Prawdzik as an estimated value of company-paid health insurance, although he had absolutely no idea of the actual amount.  *Barnes' Depo.* at 57.   Also, he had no knowledge, and failed to inquire, as to whether either Plaintiff received benefits under a 401(k) plan, benefits which he might have included in his calculations.  *Barnes' Depo.* at 61.

## IV.   THE PROPOSED TESTIMONY WILL NOT ASSIST THE TRIER OF FACT

Even if Barnes is considered an expert, expert testimony would not assist the trier of fact in the present matter to determine the amount, if any, of lost income.   Under Rule 702 of the Federal Rules of Evidence, expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a

fact in issue." The Advisory Committee's commentary to Rule 702 states that a court must use a liberal dose of common sense in determining when experts may be used:

> [T]he common sense inquiry [is] whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without the enlightenment from those having a specialized understanding of the subject involved in the dispute.

In the present matter, the jury can determine the amount, if any, of lost back pay and lost future income without the assistance of Barnes. Barnes is not offering to the jury any information or performing any calculations any one of them does not know or could not do for themselves. Barnes calls his final product, the evidence that will be submitted to a jury, his "final report." (Attached as Exhibits B1 – B8). However, the "report" is nothing more than a set of computer printouts. The printouts merely contain the result of the computer software's calculations. This cannot be considered the report of an expert.

As shown above, Barnes did not use any kind of expertise in determining the numbers to enter into the software program, he did not perform the calculations himself, and he did not perform even the slightest analysis for which an expert is required. *Barnes' Depo*. at 13-15, 28-32. Thus, MK fails to see how Barnes' testimony would assist the trier of fact in any way. The Plaintiffs' so-called "expert" simply is offering to the jury a printout of a computer's ability to perform mathematical calculations, and his testimony simply will consist of telling the jury the

results of those calculations.[2]   In short, the "untrained layman would be qualified to determine intelligently and to the best possible degree" the results of the computer's calculations on a printout.  What would aid the jury is an explanation of why he input the numbers he did.  As discussed above, Barnes does not have the answers to these questions.

Finally, MK would emphasize that Barnes spent only a few minutes entering into a software program a few numbers given to him by Plaintiffs' counsel.  *Barnes' Depo.* at 21, 66. If it took  Barnes so little time to determine lost future income, a jury could perform this task equally well without his assistance.  In short, Barnes has no expertise (and none is needed) in determining the amount of lost future income.

## V.  <u>THE PROPOSED TESTIMONY IS TOO SPECULATIVE</u>

Not only is Barnes' testimony regarding future damages based on unreliable methodology, the assumptions are too speculative and, therefore, should be excluded in accord with the Supreme Court's ruling in *Daubert* ("Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known.").  509 U.S. at 590.  The data generated by the computer software is speculative as to Prawdzik and incorrect as to Smith.

---

[2]  The jury's most difficult task will likely be discounting future dollars to present value.  However, the jury can be assisted in this task with a jury instruction, as it is nothing more than a mathematical exercise. In fact, in federal court a present value jury instruction is mandatory:

> Although . . . no single method for determining present value is mandated by federal law and . . . the method of calculating present value should take into account inflation and other sources of wage increases as well as the rate of interest, it is equally clear that an utter failure to instruct the jury that present value is the proper measure of damages award is error.

*St. Louis Southwestern Ry. Co. v. Dickerson*, 479 U.S. 409 (1985); <u>accord</u> *Hull by Hull v. U.S.*, 971 F.2d 1499, 1510-1512 (10th Cir. 1992).  The U.S. Supreme Court has affirmed that expert testimony is not necessary to determine the present value of future damages, that the jury's determination of the present value of future damages is, at best, an approximation, and that the jurors are not bound by tables, economic theories, or mathematical computations.  *Monessen Southwestern Railway Co. v. Morgan*, 486 U.S. 330 (1988).

It is too speculative to assume that Prawdzik would have worked for the next 13 years at SECOR based on his poor performance as a supervisor.[3]  As for Barnes' computation of Smith's lost future income, it is impossible to say that she would have worked for the next 29 years at SECOR.  It is a fact that she was a temporary employee, hired only for the duration of the Tar Creek cleanup project – a project which has now been completed.

## VII.  "LOST FUTURE INCOME" IS NOT RECOVERABLE UNDER TITLE VII

Under Title VII, Smith  would be entitled to recover "future pecuniary losses" if the Defendants were found to have violated Title VII.  See 42 U.S.C. § 1981a(b)(3).  The term "future pecuniary losses" is commonly referred to by courts as "front pay."  In the present matter, the Plaintiffs have not claimed "front pay," but rather "lost future income."  While the two remedies are similar, they are not the same.

Front pay is an equitable remedy, available only where reinstatement is impossible, impractical, or improper.  Front pay is a monetary award for the period of time beyond the date of the judgement and should continue only for the time period necessary to effect "make-whole relief."  See *Carter v. Sedgwick County*, 36 F.3d 952 (10th Cir. 1994).  Whether to award front pay is a matter for the court, which is granted wide discretion in determining the amount of the award.  See *Id.*  The court must set an ending date for front pay based on more than guesswork, and the time period must sufficient to make the plaintiff whole.  See *Id.*  Once the Court has determined the length of time for which the employer should be reasonably liable, it should deduct the employee's present salary from his previous salary, and multiply the difference by the relevant length of time.  That sum should then be discounted to present value, and judgment interest should be added.  See *Fournerat v. Beaumont Independent School Dist.*, 6 F.Supp2d 612

---

[3]   MK suggests that a jury would more likely conclude that, if his employment were continued at all, his salary may have been lowered or remained unchanged due to his poor performance.

(E.D. Tex. 1998). Even if the Plaintiffs intended to plead for front pay in their prayer for relief, an expert is not needed to determine the amount of the award.[4]

## VIII.  PREJUDICE OF BARNES' TESTIMONY OUTWEIGHS PROBATIVE VALUE

Rule 403 of the Federal Rules of Evidence governs the exclusion of otherwise relevant evidence.  Rule 403 applies to the admissibility of expert testimony as it applies to all other types of evidence.  Even if Barnes' testimony is otherwise admissible, his testimony may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Here, the jury will be unduly influenced and mislead.  If allowed to view Barnes' so-called "reports," the jurors may be fooled into believing that Barnes performed some sort of analysis in determining the figures listed, which he did not.

## CONCLUSION

Barnes' testimony should be excluded because he is not an expert, his testimony is unreliable, his testimony will not assist the trier of fact, determining the amount of damages, if any, is too speculative, any testimony regarding lost income is irrelevant in this case, and because  Barnes' testimony will be unduly prejudicial.

WHEREFORE, the Defendant, Morrison Knudsen Corp., respectfully requests that this Court exclude from evidence the testimony, both oral and written, of the Plaintiffs' expert witness on lost back wages and lost future income allegedly suffered by the Plaintiffs.

---

[4] The amendment cutoff in this matter expired on October 26, 1999.

Respectfully submitted,

**STRECKER & ASSOCIATES, P.C.**

David E. Strecker, OBA #8687
James E. Erwin, OBA #17615
1600 Bank of America Center
15 West Sixth Street
Tulsa, OK 74119-5410
Telephone:    (918) 582-1716
Facsimile:    (918) 582-1780

ATTORNEYS FOR DEFENDANT,
MORRISON KNUDSEN CORPORATION

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 3rd day of January, 2000, a true and correct copy of the foregoing **Defendant Morrison Knudsen's Motion in Limine to Exclude Plaintiffs' Expert Witness on Alleged Lost Income and Brief in Support** was mailed via First Class U.S. Mail, with proper postage fully prepaid thereon, to:

James R. Huber, Esq.
MALLOY & MALLOY, INC.
1924 South Utica, Suite 820
Tulsa, OK 74104-6515


William D. Fisher, Esq.
HALL, ESTILL, HARDWICK, GABLE,
    GOLDEN & NELSON, P.C.
320 South Boston, Suite 400
Tulsa, OK 74103-3708


Elaine R. Turner, Esq.
HALL, ESTILL, HARDWICK, GABLE,
    GOLDEN & NELSON, P.C.
100 North Broadway, Suite 2900
Oklahoma City, OK 73102

EXHIBIT

A

**1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4  JOLENE SMITH and JAN          )
5  PRAWDZIK,                     )
                                 )
6         Plaintiffs,            )
                                 )
7        -vs-                    )  Case No. 98-CV-0843H(J)
                                 )
8  MORRISON KNUDSEN CORPORATION, )
   and SECOR INTERNATIONAL,      )
9  INCORPORATED,                 )
                                 )
10        Defendants.            )

11        ****************
          THE DEPOSITION OF GARY BARNES, produced
12   as a witness on behalf of the Defendant Morrison
     Knudsen Corporation in the above styled and numbered
13   cause, taken on the 17th day of August, 1999, in the
     law offices of STRECKER & ASSOCIATES, 1600 NationsBank,
14   Tulsa, Oklahoma before me, Dalene Lawrence, a Certified
     Shorthand Reporter duly certified under and by virtue
15   of the laws of the State of Oklahoma, pursuant to the
     stipulations hereinafter set forth.
16        ****************

17        A-P-P-E-A-R-A-N-C-E-S

18  FOR THE PLAINTIFFS:        MR. JIM HUBER
                               Malloy & Malloy
19                             1924 South Utica
                               Tulsa, OK 74114
20
    FOR THE DEFENDANT,
21  MORRISON KNUDSEN           MR. DAVID STRECKER
    CORPORATION:               Attorney at Law
22                             1600 NationsBank
                               Tulsa, OK 74103
23  FOR THE DEFENDANT,
    SECOR INTERNATIONAL,       MS. LESLIE RINN
24  INCORPORATED:              Attorney at Law
                               320 South Boston
25                             Tulsa, OK 74103

TULSA COURT REPORTERS
320 South Boston ** Suite 1106
(918) 584-6633

**2**

1              S T I P U L A T I O N S

2

3          It is stipulated and agreed by and

4    between the parties hereto that this deposition is

5    being taken by Notice of the parties, and that the same

6    may be taken at this time and place, pursuant to the

7    Federal Rules of Civil Procedure.

8

9

10

11

12

13

14              I N D E X

15  WITNESS                                          PAGE

16  GARY BARNES

17      Direct Examination by Mr. Strecker        3

18  DEFENDANT'S EXHIBITS, marked/identification

19      No. 1                                      21
        No. 2                                      22
20      No. 3                                      23
        No. 4                                      24
        No. 5                                      25
21      No. 6                                      25
        No. 7                                      26
22      No. 8                                      55

23
    CERTIFICATE PAGE                               67
24

25

TULSA COURT REPORTERS
320 South Boston ** Suite 1106
(918) 584-6633

**3**

1              GARY BARNES,

2    of lawful age, who having been first duly sworn to

3    testify the truth, the whole truth and nothing but the

4    truth, answered in reply to the questions propounded as

5    follows:

6

7              DIRECT EXAMINATION

8    BY MR. STRECKER:

9         Q    Please state your full name.

10        A    Gary Barnes.

11        Q    All right.  And you've had your

12   deposition taken before several times, I would suspect?

13        A    Yes.

14        Q    I won't go into any of the rules with you

15   in any great detail except to say that if I ask you

16   something that you do not understand or it seems

17   unclear, just tell me and I'll rephrase the question

18   and we'll try to go on down the road in that fashion.

19   What is your business?

20        A    My occupation?

21        Q    Yes.

22        A    I'm an accountant.

23        Q    Are you in a firm?

24        A    Yes.  Barnes & Barnes, Inc.  We're at

25   71st and Yale here in Tulsa.

TULSA COURT REPORTERS
320 South Boston ** Suite 1106
(918) 584-6633

**4**

1         Q    Who's the other Barnes?

2         A    My son, Darren, D-A-R-R-E-N.  Darren

3    Barnes.

4         Q    And how long has this business been in

5    existence?

6         A    Sixteen years.

7         Q    Are you a certified public accountant?

8         A    No.

9         Q    Tell me what types of services your

10   business offers.

11        A    Primarily we focus on doing what

12   accountants call write-up work.  That's where you do

13   the financial statement preparation for companies, fill

14   out sales tax returns, reconcile their bank accounts,

15   run payroll checks; all this kind of down and dirty,

16   nitty gritty unglamorous accounting work is

17   collectively referred to as write-up work.  And we have

18   about 60 companies in Tulsa, small companies, that pay

19   us a fee each month to do their write-up work.  So that

20   would be, the preponderant amount of what we do is just

21   write-up work.  And then we get into some more exotic

22   areas like expert witness work and testifying, doing

23   court work.  That's kind of the exotic area.  We also

24   do corporate and individual tax returns for people.

25        Q    Can you estimate for me how much of your

TULSA COURT REPORTERS
320 South Boston ** Suite 1106
(918) 584-6633

5

1 income is derived from testifying as an expert witness?

2    A    Well, could I change the question to like

3 court work in general or do you want it just as an

4 expert witness, that narrow?

5    Q    Well, how much of your income is derived

6 from being consulted, testifying, just being an expert

7 witness in terms of consultation, testifying.

8    A    Oh, I'd say of the gross revenues, I

9 would say, I don't know, I'll just spit a number out,

10 I'll say 10 percent.

11    Q    What's your educational background?

12    A    I graduated from Tulsa public schools in

13 1968 and I graduated from Northeastern State

14 University. It was a college in 1972; now they call it

15 a university. But I graduated from Northeastern State

16 with a Bachelor of Science degree in 1972.

17    Q    Any further education beyond that?

18    A    No. I pretty much learned it all at that

19 level so I just shut down.

20    Q    Since graduating from college, can you

21 tell me where you have been employed?

22    A    Well, the first five years out of --

23    Q    By the way, you don't happen to have a

24 resume with you here today, do you? I wasn't provided

25 with any curriculum vitae.

6

1    A    Well, I could have faxed you one, brought

2 you one, provided you one, had you asked for it.

3    MR. HUBER: I'll get you one, David.

4    A    I can fax you one when I get back to the

5 office. It's only one page. It's not too fancy. But

6 I do have one. But my last, my first five years after

7 getting my Bachelor's degree, I worked in corporate

8 accounting here in Tulsa. I worked at Williams

9 Companies for a year. I worked at Seismograph Service

10 Corporation, which was over at 41st and Sheridan. If

11 you've been around Tulsa, you remember Seismograph.

12 And I worked at Telex for about a year or so. I don't

13 know, for the first five years, I just kind of rotated

14 around several of these larger Tulsa companies. And

15 then in 1976, I started, I got into this area of doing

16 just small business accounting. And I did that for six

17 years.

18    Q    In 1976, were you starting your own firm

19 or how did that come about?

20    A    No. I went to work for another company

21 doing essentially the same thing as I'm doing. I

22 started my company in 1983. So from '76 to '83, for

23 about a five or six-year period, however long that is,

24 I worked for another company doing small business

25 accounting.

7

1    Q    What was the name of that company?

2    A    Advanced Data.

3    Q    And you started your own business in 1983

4 then?

5    A    Yes, sir.

6    Q    And for the last 16 years you've been in

7 that company, your own company?

8    A    That's correct.

9    Q    You're, as I'm sure you understand,

10 you're being called by the plaintiffs in this case as

11 an expert witness. And I would like to know what your

12 personal opinion is of what you are an expert in. What

13 do you conceive in your own mind you're being called

14 here as an expert in what?

15    A    In establishing lost wages.

16    Q    And why do you consider yourself to be an

17 expert in establishing lost wages?

18    A    Well, I know how to do it. It's a

19 procedure I went through many times and testified in

20 court about it a lot. I don't know when you cross over

21 the threshold and become an expert witness. But if by

22 training and by experience, then I guess I would be an

23 expert at it.

24    Q    Have you ever done any teaching in

25 school?

8

1    A    No.

2    Q    Have you ever written any publications on

3 the subject of calculating lost wages?

4    A    No.

5    Q    What professional associations are you a

6 member of?

7    A    Oh, the Jenks Football Club, I guess the

8 Jenks Trojan Booster club is about the only thing I'm

9 affiliated with.

10    Q    There's no accounting organization that

11 you're a member of?

12    A    No. Could you imagine how boring those

13 meetings would be if you went to one?

14    Q    Well, I won't comment on that. I guess

15 us lawyers maybe don't have much room to talk on that

16 sort of thing. Well, you indicated you've testified in

17 court on this issue of calculating lost income before.

18 About how many times do you suppose you've testified on

19 that subject?

20    A    Well, by trial testimony and deposition

21 testimony, collectively probably in excess of 100

22 times.

23    Q    How many times in the courtroom itself in

24 front of a judge or jury?

25    A    Oh, 40 or 50, maybe.

9

1    Q       When did you first start doing this?
2    A       Oh, I would say in about the late '80s;
3    '88, '89.  I've been doing it for about ten years.
4    Q       Have all of these been in employment
5    cases or only some of them been in employment cases?
6    A       Well, I was talking about just employment
7    cases.  I've testified quite a few times in court about
8    matters totally unrelated.
9    Q       So all of these 40 or 50 times in court
10   have been employment cases?
11   A       Yes.
12   Q       And in all such instances, you have
13   testified as to lost wages, projected damages in terms
14   of lost wages in the future.  Is that correct?
15   A       Yes.
16   Q       How many times or what percentage of the
17   time do you testify for the plaintiff?
18   A       100.
19   Q       Have you ever been consulted by a party
20   in a litigation but not asked to testify, either at a
21   deposition or at trial?
22   A       Have I ever been consulted by what now?
23   By a client?
24   Q       By a party.
25   A       By a party.

11

1           MR. HUBER:  Come here.
2           THE WITNESS:  I thought he was talking
3    about Tulsa only.
4    A       I have testified in the Western District
5    Federal Court several times.
6    Q       In Oklahoma City?
7    A       Yes.  And in Lawton.
8    Q       Can you remember the names of the parties
9    involved in the last Federal court case you've
10   testified at involving employment matters?
11   A       Lord, I couldn't remember what courtroom
12   it was, let alone the parties.  No, I don't log them or
13   try to schedule them or track them.  They just bleed
14   together.  I couldn't, I don't even know the last case
15   I testified in.  They just become numbers after a
16   while.
17   Q       Who was the attorney in the last case you
18   testified?
19   A       I don't know.
20   Q       Have you ever testified for Mr. Huber
21   before?
22   A       Yes, I have.
23   Q       And how many of those were employment law
24   cases?
25   A       Well, I think each time I've testified at

10

1    Q       Or their attorneys.
2    A       Okay.  I don't exactly understand that.
3    Q       Has someone ever consulted about damages
4    and possibly testifying for them but they never asked
5    you to testify?
6    A       Oh, maybe off the cuff I might have
7    gotten a brief phone call from somebody.  I have had
8    law firms contact me about possibly testifying for them
9    and then, you know, then I end up not doing it.  So I'd
10   have to say the short answer to your question is yes,
11   that has happened.
12   Q       Has any court refused to accept you as an
13   expert witness?
14   A       No.
15   Q       How many times have you testified in the
16   Federal Court here in Tulsa on employment matters?
17   A       I don't know.  In the Federal Court --
18   that's the Page Belcher building, isn't it?
19   Q       Yes.
20   A       I don't think I've ever, I don't think
21   any.  I think when it's come to Tulsa, it's been in
22   District Court, not Federal Court.
23   Q       State Court?
24   A       Yes, sir.
25   Q       Okay.

12

1    the request of Mr. Huber has been an employment matter.
2    Q       Do you remember how many times you've
3    testified for Mr. Huber, approximately?
4    A       Oh, six or ten, maybe.
5    Q       Have you ever testified for Pat Malloy,
6    either the senior Pat or the younger Pat?
7    A       Yes.
8    Q       Have you ever testified for either of
9    them in an employment case?
10   A       Yes.
11   Q       Both attorneys or just one of them?
12   A       Both.
13   Q       About how many times have you testified
14   for both big Pat and little Pat in employment cases?
15   A       In employment cases?
16   Q       Yes.
17   A       In a courtroom or would that include
18   deposition?
19   Q       Let's include depositions, too.
20   A       Oh, 30 to 40 times, maybe.
21   Q       And speaking of lost income, the subject
22   that you're testifying about here today, what sources
23   do you consider to be authoritative in that field?
24   A       Well, I don't know.  I find that question
25   a little ambiguous.  I hate to, I'm not trying to be

13

1 critical.
2     Q      What sources do you look at?
3     A      Well, what sources do I utilize to do my
4 calculations?
5     Q      Yes.
6     A      Because that's different than saying
7 authoritative.
8     Q      Yeah, I know. We'll get to that next.
9 Since the first question was vague, let's examine what
10 you look at when you go to testify.
11    A      Okay. In order to prepare a calculation
12 of the lost wages, I have to look at the payroll
13 records of the client to establish what their earnings
14 were from the company that they were working at where
15 they were terminated. Then also look at their earnings
16 from the post-termination. So essentially, I'm looking
17 at various payroll records.
18    Q      Anything else?
19    A      No. I think it's just primarily all
20 paperwork.
21    Q      Well, let's just be specific. What do
22 you look at to determine how to reduce something to
23 present value?
24    A      How do I do that?
25    Q      No; what do you look at? What source do

14

1 you look at?
2     A      I have a computer software program that
3 does it.
4     Q      What's the name of that program?
5     A      Present Value Calculator.
6     Q      Is that commercially available?
7     A      Yes. I bought it through a software
8 company in California.
9     Q      Is it designed for employment law cases?
10    A      I don't know. I don't know.
11    Q      Is it designed for personal injury cases?
12    A      I don't know.
13    Q      Do you remember the name of the company
14 you bought it from?
15    A      No, I don't.
16           MR. STRECKER: Do you want to take a
17 break?
18           (Whereupon, a brief recess was
19 taken off the record by those present).
20    Q      (BY MR. STRECKER) So you look at payroll
21 records, post-termination records and you have your
22 Present Value Calculator. What do you look at to
23 calculate work life expectancy?
24    A      The software does that. The computer
25 software.

15

1     Q      How about mortality?
2     A      The software does it.
3     Q      What do you look at to calculate real
4 wage growth?
5     A      Nothing.
6     Q      You don't factor that? I noticed you
7 didn't do it in your calculations here. You just don't
8 use that as a factor?
9     A      No.
10    Q      I also notice in your calculations here
11 you didn't throw in an inflation factor. Is that
12 common or is this unique for you?
13    A      That's the way I always do those.
14    Q      Okay. Do you ever consult any
15 information put out by the Bureau of Labor Statistics
16 when you do these calculations?
17    A      Well, the software program incorporates
18 the Bureau of Labor Statistics figures in there.
19    Q      So other than using the software, you
20 look at the payroll records, post-termination records,
21 plug that data into your software program. And what
22 else do you do?
23    A      I don't plug anything. That's a nasty
24 word to an accountant. I might enter it, but I don't
25 plug it. There's a joke. I'm trying to get you to

16

1 smile one time.
2     Q      I do occasionally.
3           MR. HUBER: Just answer.
4     A      But anyway, yes, I take the payroll
5 records to establish what they were making at the time
6 they were terminated and what they've made
7 post-termination, and I gather up that information and
8 then with the assistance of this computer software
9 program, I can calculate work life expectancy and what
10 the future lost earnings were.
11    Q      Is there anyone in the Tulsa area that
12 you would consider better qualified than you as an
13 expert on this subject?
14    A      I wouldn't know.
15    Q      There are others in this area that
16 testify on this, I think we can all agree on that. Do
17 you know of any of the others who do?
18    A      No.
19    Q      What are your fee arrangements with
20 Mr. Huber in this case?
21    A      $75 an hour.
22    Q      Is that depending on what you're doing?
23 Is that $75 whether you're working in your office,
24 testifying in court, or it doesn't matter?
25    A      It doesn't matter.

17

1  Q     Now, is your fee arrangement with
2  Mr. Huber in this case the same as the arrangements
3  you've made with him in other cases?
4  A     Yes.
5  Q     Is the $75 an hour the fee you charge
6  other attorneys for testifying in similar cases?
7  A     Yes.
8  Q     What correspondence has transpired
9  between you and Mr. Huber regarding this matter?
10 A     Oh, one or two faxes that he's faxed my
11 office some information that I had to utilize to
12 prepare the loss damages work sheet.
13 Q     Have you brought your file with you
14 today?
15 A     No.
16 Q     Have your fees been paid in this case?
17 A     Not invoiced and not paid.
18 Q     Do you invoice your clients such as
19 Mr. Huber in regular intervals or do you wait until a
20 case is over or how do you do that?
21 A     I'll wait till it's over.
22 Q     Has Mr. Huber actually asked you to
23 testify in this case?
24 A     No.  He's just asked me to prepare the
25 work sheet.

18

1  Q     Do you have any financial interest at all
2  in the outcome of this case?
3  A     No.
4  Q     To your knowledge, did Mr. Huber consult
5  with any other expert with regard to the damages in
6  this case?
7  A     No.
8  Q     You weren't shown any other prior report
9  done by another economist or accountant?
10 A     No.
11 Q     What did Mr. Huber ask you to do in this
12 case?
13 A     Prepare a calculation of the plaintiff's
14 back lost wages and future lost earnings.
15 Q     And is this true in the case of both
16 plaintiffs, Jolene Smith and Jan Prawdzik?
17 A     Yes.
18 Q     Did he ask you to do anything other than
19 that?
20 A     No.
21 Q     He didn't ask for your opinion on
22 anything else?
23 A     No.
24 Q     For instance, he did not ask for your
25 opinion on whether the two individuals mitigated their

19

1  damages?
2  A     No.
3  Q     Do you consider yourself to be a
4  vocational expert, to have knowledge of jobs in the
5  labor market and what jobs are available and what jobs
6  are in demand?  Do you know anything about that?
7  A     No.  I know something about it.  I don't
8  consider myself an expert.
9  Q     And Mr. Huber has not consulted you for
10 anything of that nature?
11 A     No.
12 Q     In preparing your opinion in this case,
13 did you ever speak with either of the two plaintiffs
14 directly, Jolene Smith or Jan Prawdzik?
15 A     I don't recall.  I might have had a phone
16 conversation.  I haven't met them, I don't think,
17 face-to-face.  But I might have talked to them over the
18 phone.  It's been several months since I first got
19 involved in this, and I honestly don't remember.
20 Q     Do you remember when you were first
21 approached to assist in this matter?
22 A     Oh, I think it was sometime, I think it
23 was last year.  I think it's been going on for several
24 months.
25 Q     You don't remember any more specifically

20

1  than that?
2  A     No.
3  Q     Was Mr. Huber the one who approached you,
4  or someone else?
5  A     I believe it was Mr. Huber.
6  Q     What does your file contain in this
7  matter?
8  A     It contains some photocopies of source
9  documents like W-2 forms and payroll stubs, stuff that
10 I referred to earlier to establish what their earnings
11 were.  I have some hard copies of some of that.  I've
12 got a client questionnaire that I have each person,
13 have each client fill out when I first get involved.
14 It shows me their name, address, age, sex and some of
15 this other stuff.  It's just a one-page questionnaire.
16 And I've got one of those filled out.  And then I've
17 got a, I think I've got one or two faxes that I
18 received from Mr. Huber's office.
19 Q     Anything else besides that?
20 A     I don't think so.
21 Q     Did I ask you the name of the company out
22 in California that made that software?
23 A     Yes.
24 Q     And you didn't know the name?
25 A     No.  I bought it several years ago and I

21

1 don't recall.
2    Q    Well, what did you do with this
3 information that you just mentioned, the W-2, the
4 questionnaire and so on?
5    A    Well, taking the questionnaire in concert
6 with the payroll source documents, I prepared the lost
7 calculation work sheet for each of the two plaintiffs.
8    Q    How long did it take you to do it? Let's
9 just take Ms. Smith first. How long did it take you to
10 do hers?
11    A    Oh, just to do the loss calculation, to
12 do the work sheet just takes a few minutes. I mean,
13 you can do one in 30 minutes once you have the
14 information in front of you. The work sheet itself is
15 really simple.
16    Q    Let's take a look at some of the things
17 that were provided to me by Mr. Huber. And we'll first
18 identify them for the record and then we'll go over
19 them.
20              (Whereupon, Defendant's
21 Exhibit No. 1 was marked for identification).
22    Q    The first document I want to show you
23 I've marked as Defendant's Exhibit 1. Can you tell me
24 what that is?
25    A    This is page 2 of my loss calculations

22

1 summary on Jolene Prawdzik. It's a by-product of that
2 computer software program I've referred to on several
3 occasions. It's actually the page that calculates the
4 future lost earnings.
5    Q    Well, let me show you what I've marked as
6 Number 2.
7              (Whereupon, Defendant's Exhibit
8 No. 2 was marked for identification).
9    Q    What's this document?
10    A    It's the same thing as Item Number 1, but
11 with a different annual earnings used as the basis for
12 the present value calculation.
13    Q    Now, you said that Number 1 was the
14 second page of the document. What would the first page
15 be?
16    A    It would be --
17    Q    Would it be one of these?
18    A    Yes.
19    MR. STRECKER: And I'm referring to the
20 loss projection schedules for purposes of the record.
21    Q    So Number 2 is the same as Number 1,
22 except for a different assumption concerning annual
23 earnings. Is that correct?
24    A    Yes, sir.
25              (Whereupon, Defendant's Exhibit

23

1 No. 3 was marked for identification).
2    Q    All right. I'm showing you now what I've
3 marked as Defendant's 3. So far, all of these
4 documents have referred to Jolene Smith. I'll call her
5 Smith. But I guess her name now is Prawdzik also. Is
6 that correct?
7    A    That's my understanding.
8    Q    What is Number 3, Mr. Barnes?
9    A    Number 3 is a loss projection schedule on
10 Ms. Prawdzik prepared by me on 8/13/99. And this
11 particular loss projection schedule shows total damages
12 of $222,000.
13    Q    And this assumes an $8.50 an hour pay
14 rate. Correct?
15    A    Yes.
16    Q    I notice this is marked "Draft". Is
17 there any particular reason why it is a draft?
18    A    Well, yes, it's not uncommon to be in the
19 process of preparing these loss projection schedules
20 that you get more current topical information on what
21 my client has made since they were terminated. They're
22 changing jobs and, you know, getting pay raises. So
23 more times than not, I have to do several versions of
24 these loss calculation schedules before you would get
25 one that you're ready to go to battle with.

24

1    Q    So it's a draft in the sense that you
2 maybe don't have all of her post-termination earnings?
3    A    Well, it's a draft in the sense that it
4 might not be 100 percent accurate and I might have to
5 amend it at some time in the future and correct some
6 mistake on it.
7    Q    Well, assuming there's no mistake on the
8 document as it exists now, then what would be some of
9 the reasons you might have to correct it in the future,
10 other than more earnings data?
11    A    Well, more earnings data, I have to use a
12 discount factor for future lost earnings and that
13 figure almost changes every day. So you know, you look
14 at the discount factor and just more earnings; that
15 primarily would be the two areas that would require a
16 change.
17    Q    I take it all the documents we've
18 reviewed thus far were prepared by you. Is that
19 correct?
20    A    Yes, sir.
21              (Whereupon, Defendant's Exhibit
22 No. 4 was marked for identification).
23    Q    I'm showing you Number 4. What is this
24 document?
25    A    It's another version of Ms. Prawdzik's

**25**

1 damages.  It was prepared on August 13 by me and the
2 total damages on this one is $198,000 as opposed to
3 Number 3 which is $222,000.
4    Q    On this one you're using $8.00 per hour
5 as an hourly wage.  Is that correct?
6    A    Yes.  Her termination rate was $8.00 per
7 hour.
8              (Whereupon, Defendant's Exhibit
9 No. 5 was marked for identification).
10   Q    Now, I want to show you Number 5 and ask
11 you to tell me what that document is.
12   A    It's another version of Ms. Prawdzik's
13 damages prepared on 8/13/99 and it's showing $223,000
14 of damages.
15   Q    The main difference between this one and
16 the one we just looked at is you don't assume any
17 interim earnings.  You don't assume minimum wage as the
18 interim earnings here.  Is that correct?
19   A    Well, no, that's partly correct, maybe.
20 On the most recent one you've handed me, Number 5,
21 under Back Lost Wages, I had not reduced her total back
22 lost wages by anything other than $1,000 that she had
23 earned at an employer called OHM.  Whereas in Number 4,
24 I had factored in a minimum wage.  So that would be the
25 difference between 4 and 5.

**26**

1    Q    I mismarked this next one.  I'm going to
2 change it to from 1 to 6.
3              (Whereupon, Defendant's Exhibit
4 No. 6 was marked for identification).
5    Q    This is a lost income schedule for
6 Mr. Prawdzik.  Correct?
7    A    Yes.
8    Q    Now, I did not receive any kind of -- I
9 forget what you referred to this as -- I didn't receive
10 one of those for Mr. Prawdzik.  Did you do one for him?
11   A    Yes, sir.
12   Q    Did you only do one version for Prawdzik?
13   A    Well, I have to go to page 2, Counselor,
14 that you're holding in your right hand, any time
15 anything changes the present value, future lost
16 earnings, we have to generate another page 2.  If it's
17 just affecting back lost wages, we don't have to
18 generate another page 2.  But I can't get to total
19 damages without generating page 2 at a minimum.  I have
20 to do it once.
21   Q    This is page 2?
22   A    Yes.
23   Q    So you've got a page 2 for Prawdzik.
24   A    Yes.
25   Q    Now, did you do more than one schedule

**27**

1 for him?
2    A    For Jan?
3    Q    For Mr. Prawdzik?
4    A    For Mr. -- Yes.  Jan is Mister.  Right?
5    Q    Yes.
6    A    I don't know.  If you show me one I'll
7 say I did.
8    Q    That's all I got.
9    A    It's probably the only one I did.  But
10 you should have page 2, because one had to been
11 done.
12   Q    Right, okay.  Well, we'll get that.
13        MR. HUBER:  I don't have it.
14        MR. STRECKER:  You don't have it?
15        MR. HUBER:  I don't think I got it.
16   Q    (BY MR. HUBER)  Do you think your office
17 has it?
18   A    Yes.
19   Q    Could they fax it over here?
20   A    Yes.
21        MR. HUBER:  Do you want to do that?
22        MR. STRECKER:  Sure.
23        MR. HUBER:  If it's just a one-page
24 resume, let's let him do that.  Let me give you my fax
25 number.  Let's go off the record here.

**28**

1              (Whereupon, a brief recess was
2 taken off the record by those present).
3        MR. STRECKER:  Let's go back on the
4 record.
5    Q    (BY MR. STRECKER)  Other than the reports
6 that we have just identified and the one you're going
7 to have faxed over, did you prepare any other report
8 with regard to this case?
9    A    No.
10   Q    Other than the documents you've already
11 told me about that you've looked at, have you any other
12 documents with regard to this case?
13   A    No.
14   Q    Other than what we've explained already?
15   A    No.
16   Q    Let's go over, let's start with Exhibit 1
17 and go over some of these figures that you have on this
18 page.  The first thing I want to ask you about is the
19 life expectancy of Ms. Smith and Ms. Prawdzik -- I guess
20 we'll call her Ms. Smith right now.
21        MR. STRECKER:  Can everyone agree on
22 that?  It will help so Dalene won't have to type that
23 last name.
24   Q    The life expectancy of 48.2 years, does
25 that come from your software program?

## 29

```
1     A     Yes.
2     Q     Now, there is a reference to percent of
3  disability.  Do you see that?
4     A     Yes.
5     Q     What does that refer to?
6     A     What that refers to is the, you have to
7  go down two or three lines where it shows the inner
8  annual earnings of $13,088.  I want to calculate the
9  future lost earnings on 100 percent of that figure.
10    Q     Now you've lost me.  You want to
11 calculate the annual earnings based on 100 percent of
12 that figure?
13    A     Yes.  The plaintiff was making, I'm doing
14 the present value calculation on loss of annual
15 earnings of $13,088 and I want to calculate the future
16 lost earnings based on 100 percent of that number.
17    Q     Well, what does the term "disability"
18 refer to?
19    A     I don't know.
20    Q     Have you ever testified in personal
21 injury cases on future lost earnings, a car accident or
22 a work accident or something like that?
23    A     I don't know if I have or not.
24    Q     Do you use this software for anything
25 other than calculating future lost earnings?
```

## 30

```
1     A     No.
2     Q     Do you have any knowledge as to whether
3  this term "disability" could refer to a physical
4  injury?
5     A     No.
6     Q     Now, there is a figure of work life
7  expectancy based on educational attainment of 21.1
8  years.  Is that something the software gives you?
9     A     Yes.
10    Q     And would your answer be the same for the
11 years remaining until final retirement and the average
12 number of years remaining in the work force?
13    A     Yes.
14    Q     What is the difference between the
15 average number of years remaining until final
16 retirement and the average number of remaining years in
17 the labor force?
18    A     Well, I'm not exactly sure.  I think one
19 explanation of that might be people retire early, you
20 know, maybe they retire at age 58 when statistically
21 they could have went on till they're 65.  So that
22 number is not going to match up just year-by-year.
23    Q     So I guess you're not really sure where
24 those two figures, why there's a difference between
25 those two figures there?
```

## 31

```
1     A     No.
2     Q     I notice in some of your calculations,
3  you use the 28.7.  Or I think in her case, you use 29
4  years.  Does that come from the 28.7 years?
5     A     Yes.
6     Q     In fact, it's right here on this page, it
7  says Enter Years and you've got 29.
8     A     Yes.  And the computer does that.  As a
9  matter of fact, on this work sheet, it asks me for a
10 prompt for their age up at the top and their sex and
11 their race.  And so I enter a response to those three
12 prompts and then it takes off.
13    Q     Now, it says "based on educational
14 attainment".  Do you enter the level of education?
15    A     Yes.
16    Q     Maybe I'm just missing it, but I don't
17 see that here anywhere on it.
18    A     Yes, it does ask, there's a prompt on
19 there for that, it asks you whether -- you have four
20 prompts.  Like zero to tenth grade, tenth through 12th,
21 college graduation.  I don't know, I think there's four
22 answers there.  And you have to pick one of the four.
23    Q     Now, the paragraph of type at the bottom
24 of the page, is that something that the software prints
25 out?
```

## 32

```
1     A     Yes.
2     Q     Do you happen to know if the BLS has
3  anymore recent data than 1985?
4     A     No, I don't personally know.
5     Q     And the revised work life tables look
6  like they're 1979 or 1980.  Do you happen to know if
7  the BLS or the Department of Labor has produced
8  something more recent than that?
9     A     I don't know.
10    Q     On Defendant's 2, if you would, look at
11 that now.
12    A     (Witness complies).
13    Q     What is the difference between
14 Defendant's 1 and Defendant's 2?
15    A     The annual earnings amount, which is
16 right below the line.
17    Q     And why is there a difference in annual
18 earnings here?
19    A     Well, I would have to --
20    Q     Feel free to refer to the other schedules
21 if you'd like.
22    A     Okay.  Exhibit Number 2 matches up with
23 Exhibit Number 4 and Exhibit Number 1 matches up with
24 Exhibit Number 3.  And it has to do with something we
25 touched on earlier, and that is factoring an amount for
```

33

1 a minimum wage earned by the plaintiff during the
2 post-termination period.
3       Q       Let's take a look at Number 3 then and
4 try to relate that.  Exhibit Number 3, I believe we
5 have established assumes an $8.50 per hour wage rate.
6 Is that correct?
7       A       Yes.
8       Q       And if I understand this correctly, we
9 assume $8.50 per hour times the 2,080 hours of regular
10 time.  Is that right?
11      A       Yes.
12      Q       And then you assume 40 hours of overtime
13 per month at time and a half for 12 months.
14      A       Yes.
15      Q       And then you add those two figures and
16 that would be her total annual compensation and
17 benefits.
18      A       Yes.
19      Q       Let me ask you why you assumed $8.50 per
20 hour.
21      A       It's my understanding from Mr. Huber and
22 from Ms. Smith that she was scheduled to be increased
23 to $8.50 an hour within days before she was terminated.
24 So at the request of Counsel, I did a calculation at
25 $8.50 an hour.

34

1       Q       Did you do a calculation at $7 per hour
2 which was the wage she was making when she was
3 terminated?
4       A       No.  It's my understanding she was making
5 $8 when she was terminated.
6       Q       And then where did you get your figure to
7 use on the overtime, average monthly overtime hours?
8       A       From the client questionnaire that Ms.
9 Smith filled out.
10      Q       All right.  So we take next, as I
11 understand Number 3 -- I'm still looking at Number 3.
12 I'm sorry -- we take the number of months from April of
13 1997, which was her termination, until July, 1999, the
14 last full month here, and that's 28 months.  Is that
15 correct?
16      A       Yes.
17      Q       And then you take the $23,800 that you
18 calculated as her average annual income and you divide
19 that by 12 on your next line.
20      A       Correct.
21      Q       Am I correct?
22      A       Yes.
23      Q       And that comes out to $1,983.33.
24      A       Yes.
25      Q       And then you multiply that by the 28

35

1 months between April of 1997 and July of 1999 and you
2 come up with the $55,533.  Is that correct?
3       A       Yes.
4       Q       So that would be her back pay, based on
5 your assumptions, then?
6       A       Yes.
7       Q       Is there any particular reason you assume
8 that this lady would have worked from April of '97
9 through July of '99 at SECOR?
10      A       No.
11      Q       Did you understand that she was a
12 temporary laborer working on an as-needed basis?
13      A       I don't know about that.
14      Q       I gather that you don't have any personal
15 knowledge of the facts of this case; you're like most
16 experts and don't really know about what happened and
17 why she was terminated and that sort of thing.
18      A       I don't get involved in that part of it.
19      Q       I asked you a question earlier and I
20 don't want to go over the same ground twice, but you
21 never had any conversations with either Jolene Smith or
22 Jan Prawdzik about their termination?
23      A       No.
24      Q       Who said what to whom or whatever?
25      A       No.

36

1       Q       Now, going on down this form, we see that
2 there is a Post-Termination Earnings category and you
3 have her employment with OHM there, referred to.  And
4 that was $1,800.  Correct?
5       A       Yes.
6               MR. HUBER:  Can we go off the record?
7 Are those the documents?  Can I look at them?
8               MR. STReCKER:  Oh, yes.  Let's go off the
9 record.
10              (Whereupon, a brief recess was
11 taken off the record by those present).
12              MR. STRECKER:  Let's go back on the
13 record.
14      Q       (BY MR. STRECKER) Let's identify a
15 couple more documents we were just presented.  I'm
16 showing you Number 7.  Now, can you tell me what that
17 is?
18              (Whereupon, Defendant's Exhibit
19 No. 7 was marked for identification).
20      A       Yes.  Exhibit 7 is page 2 of
21 Mr. Prawdzik's loss calculation report.  It shows
22 present value of future lost earnings of $404,672.
23      Q       And it's got that 100 percent of
24 disability figure up there.  Work life expectancy --
25 it's got all the same figures as before.  And then

1 Number 8 is your resume, I gather.
2    A    Such that it is. Yeah, you might want to
3 get that one laminated.
4    Q    Is this the only resume, the current
5 resume that you have?
6    A    Yes.
7    Q    Let's go back to Number 3 if we might,
8 please. I believe we were talking about the OHM
9 calculation. There was $1,800 per month.
10    A    Well, that's not per month.
11    Q    I'm sorry. That was her income from OHM,
12 post-termination. Excuse me. And then you have used a
13 minimum wage of $5.15 per hour for 28 months which is
14 the back-pay period from April till July.
15    A    Yes, sir.
16    Q    April of '97 to July of '99.
17    A    Yes.
18    Q    And you used 173.33 hours per month.
19 Does that equate to 2,080 hours per year?
20    A    Yes.
21    Q    And that figure is $24,994?
22    A    Correct.
23    Q    That's assuming she made minimum wage
24 from the time of her termination to the end of last
25 month, added those two together and you come up with a

1 total interim earnings of $28,739 and some change.
2    A    Well, you call them interim earnings. I
3 call it, refer to it as net back lost wages.
4    Q    Well, interim earnings would be, interim
5 earnings to me means what you made since your
6 termination.
7    A    Okay.
8    Q    And we have, in your particular case, we
9 have got actual interim earnings which was what she
10 made from OHM and then we have what I would call
11 constructive interim earnings, which would be the
12 minimum wage amount. And you subtract that from your
13 $55,000 figure and then you come up with your net lost
14 wages of $28,000?
15    A    Yes.
16    Q    You don't have any knowledge of when Ms.
17 Smith would have, when her work would have ended there
18 at the Tar Creek project, do you?
19    A    No.
20    Q    Do you have any knowledge of the nature
21 of the work she was doing there?
22    A    No, other than I just recall hazardous
23 waste. I don't really know.
24    Q    Do you have any knowledge of her work
25 history while at SECOR at the Tar Creek project,

1 whether she was promoted, whether she was transferred
2 from job to job or anything of that nature?
3    A    No.
4    Q    Why are you assuming a minimum wage
5 earning?
6    A    Well, I did that, that $24,994, that was
7 at the request of Mr. Huber.
8    Q    No other reason besides that?
9    A    No.
10    Q    It's not based on anything about the job
11 market in that area or anything of that nature?
12    A    No. Quite simply, Mr. Huber asked me to
13 do a work sheet with that item.
14    Q    He asked you to do it and you did it?
15    A    Yes.
16    Q    I gather you're not testifying on
17 causation, are you? You're not testifying that the
18 wrongful termination caused these future losses, are
19 you?
20    A    Well, I don't know. That's kind of, I
21 don't know. You referred to something about causation,
22 and then you got into something else. I don't know.
23    Q    Let's try to make it as simple as we can.
24 Are you testifying that, because of her termination
25 from SECOR's employment, Ms. Smith suffered $222,000

1 and some odd cents worth of damage. Is that your
2 testimony?
3    A    Ask that one more time, please.
4    MR. STRECKER: Well, let's read back the
5 testimony to him.
6    (Whereupon, the previous
7 question was read from the record by the Reporter).
8    A    Yes.
9    Q    Now let's talk about the lost future
10 earnings. The annual compensation benefits at
11 termination come from what we've talked about earlier,
12 the $23,000. And then you take what you call current
13 earnings, which is the minimum wage times 2,080 hours
14 and that comes up to $10,712. Correct?
15    A    Yes.
16    Q    This is per year?
17    A    Yes.
18    Q    And so you subtract the $10,000 figure
19 from the $23,000 figure and you've got an annual, what
20 you call an annual decrease in compensation of $13,088.
21    A    Yes.
22    Q    And then you take that and you project it
23 for the next, looks like 29 years, which equates to
24 her, if I'm not mistaken, average number of years
25 remaining until final retirement from the labor force.

## 41

1    A    Yes, as reflected on Exhibit Number 1.

2    Q    Correct.  And the present value of that
3  equals $193,827?

4    A    Yes.

5    Q    Why did you project this out for 29
6  years?

7    A    That's how many years she had remaining
8  in the work force; she had 29 years.

9    Q    And why didn't you figure in, if you were
10  going to use minimum wage, why didn't you figure in any
11  increases in minimum wage?

12    A    Well, I didn't do that because when I do
13  these loss calculation schedules, and when I do them
14  for anybody at any time, I always apply the same
15  methodology.  But at the time she was terminated, I
16  figured that she would make $8 -- whatever she was
17  making at the time of the termination, I strung that
18  forward 29 years.  And I do the same on the other side,
19  on post-termination.  I don't get into this routine of
20  trying to forecast what cost of living wages would be
21  and all that.  So I just take it, what it existed at
22  the time of the termination.  So under that strategy,
23  then you don't factor in raises and all that.

24    Q    What is the 5.2 percent figure?  What
25  does that represent?

## 42

1    A    That is the one-year T-bill rate.

2    Q    And why do you use the one-year T-bill
3  rate?

4    A    Oh, it's a fair amount to use.  More
5  often quoted and figured.

6    Q    Why is it fair?

7    A    Oh, I don't know why it's fair.  It just
8  is.  But it's a common interest rate.  And I don't
9  know, I just think it's a fair and equitable percentage
10  to use.

11    Q    Do you know if your average wage rate
12  growth, real wage rate growth is less or more than
13  T-bills, historically?  Let's say one-year T-bills,
14  since that's what you use.

15    A    Is the average real wage growth?

16    Q    Yes.

17    A    I would say over the long haul, it would
18  be less than that.

19    Q    I'm sorry.  Which would be less than
20  what?  The wage growth would be less than the T-bill
21  rate?

22    A    Yes.

23    Q    Your software doesn't take into
24  consideration anything particular to the plaintiff in
25  determining work life expectancy, does it?

## 43

1    A    Not to my knowledge.

2    Q    You don't input any data concerning how
3  long she held jobs in the past or anything of that
4  nature?

5    A    No.  As I mentioned earlier, it might be
6  worthy to reiterate it.  I put in age, sex, race, how
7  far they got in school.  And those are the four
8  intangibles that I enter a response to.  And then
9  that's it.

10    Q    And these calculations that the software
11  performs here, they don't take into account any
12  possibility that she might have left the labor market
13  and then come back into the labor market.  They assume
14  continuous employment; isn't that correct?

15    A    Yes.

16    Q    Do you have any, I mean, have you ever
17  reviewed any statistics by the Department of Labor or
18  the BLS that show what the probability is that someone
19  of Ms. Smith's age and sex and race continuously stay
20  in the labor force for that long of a time?

21    A    No.  I've done no such analysis.

22    Q    Would it surprise you if I told you that
23  those figures show that most people of her age, sex and
24  race don't stay in the labor force for 29 consecutive
25  years?

## 44

1    A    Oh, I don't know.  I don't know.

2    Q    Given the fact that, and maybe you didn't
3  know this, but given the fact that Ms. Smith was
4  working at basically a construction type job that had a
5  definite ending date -- in fact, her company is no
6  longer there at that site -- don't you think that
7  projecting out the income she was making there for 29
8  years is a little bit on the speculative side?

9    A    No.  I think it's the best information
10  available.  And it's what existed at a certain period
11  of time that we know that's happened.  So it's
12  something we can analyze and put our finger on.  So the
13  amount is not speculative, I don't think.  Now, you
14  know, if you want to talk 29, 28 years, 25 years, I
15  don't know.  But the amount, I think it's a reasonable
16  way to approach calculating damages.

17    Q    Even for someone in her position?  For
18  instance, if Ms. Smith would have -- well, let me ask
19  this:  Do you understand if Ms. Smith would have
20  remained in SECOR's employment and not been terminated,
21  that today she would no longer be employed by SECOR?

22    MR. HUBER:  I'm going to object as to the
23  form.  Assuming facts not in evidence.  I think
24  Mr. Strecker is making a conclusion that he cannot make
25  whether or not she would still be employed at SECOR.

45

1           MR. STRECKER:  Well, they've demobilized
2 from the site.
3      Q      Did you understand that?
4      A      Do I understand your question?
5      Q      Yes.
6      A      I think so.  I've almost forgot it.
7      Q      Well, let me ask it again.  In performing
8 these calculations, you did not take into account the
9 fact that if she would have remained with SECOR, had
10 she not been terminated, that she would not be employed
11 there today at the Tar Creek project?
12     A      No.
13     Q      You're not saying in these calculations,
14 are you, that Ms. Smith would have remained, if she had
15 not been terminated in April of 1997, that she would
16 have remained with SECOR for 29 or 30 years?  You're
17 not saying that, are you?
18     A      Well, I don't know.  What I'm saying is
19 I've calculated damages based on 29 years.
20     Q      Based on her remaining with SECOR for 29
21 years?
22     A      Yes.
23     Q      Where do you come up with your assumption
24 that she would have remained with SECOR for 29 years?
25     A      Well, the 29 years was a function of the

47

1 to die this year?
2      A      Yes.
3      Q      And the same for the next year and the
4 same and same and same?
5      A      Uh-huh.
6      Q      And the same for Ms. Smith?
7      A      Yes.
8      Q      Do you know if your software takes that
9 into account?
10     A      Well, you just asked me that and I said I
11 don't know.
12     Q      Your software, as I understand it,
13 assumes a level wage rate that she's going to make.
14 Right?
15     A      Well, the software doesn't.  I instruct
16 it that.  That's me.  That's my brain at work.  But
17 you're correct in that I do assume a level amount of
18 what she was making when she was terminated.  I let all
19 that out 29 years.  And then what she's making
20 post-termination, which I've just factored in at minimum
21 wage, that she would be making minimum wage.  I take
22 that out 29 years.  I don't fenagle either one of those
23 two numbers.
24     Q      So basically your calculations assume
25 she's going to be at SECOR for 29 years making the same

46

1 computer software.  But the rest of it is just my own
2 way of doing a calculation.
3      Q      So you're not testifying here today then
4 that if she had not been terminated, she would have
5 remained with SECOR for 29 years.  You're not saying
6 that, are you?
7      A      No.
8      Q      Would you agree with me when I say that
9 if she would have not been terminated, we really have
10 no idea of knowing where she'd be employed today?
11     A      I don't know if I'd say no idea.  She
12 might still be with SECOR.  I mean, it's kind of a
13 fuzzy question.  I don't know.
14     Q      Well, do you think my question is any
15 fuzzier than assuming she would be with SECOR for 29
16 years, which your calculations seem to assume?
17     A      I don't know.  I hate to say I don't
18 know, but I don't know.  Your questions are over my
19 head.  You're losing me.
20     Q      Do you know if your software's
21 calculations account for mortality by year?
22     A      Gosh, I don't know.
23     Q      Isn't it true that in any given year of
24 our lives, like you and I are about the same age, that
25 there's a certain mortality percentage that we're going

48

1 wage.  And it also assumes that the minimum wage, she'd
2 be making minimum wage for 29 years.
3      A      Yes.
4      Q      Without any changes or fluctuations?
5      A      That's correct.
6      Q      Is it true that in your typical person,
7 your average person, their wage rate tends to go up for
8 a while, peak, and then go down as they get older?  Do
9 you know if that's true or not?
10     A      I don't know.  It might be in some
11 sectors of the employment field but not others.
12     Q      Do you know what I mean when I say real
13 wage growth?
14     A      Oh, I've got, I've probably got a working
15 idea of what that might mean.
16     Q      What is your idea of what that means?
17     A      Real wage growth?  Well, you might mean,
18 I don't know, but you might mean the amount of your
19 wages that, the increases that you receive in the
20 future minus the cost of inflation.  Some people might
21 could say that's what that would be.
22     Q      Do you know if historically that wages
23 have always seen a real wage growth, or have we ever
24 seen a real wage decrease in any particular industry or
25 secular economy?

49

1    A    I'd say we've had some decreases.
2 Probably back in the '70s we suffered some of that.
3    Q    Is there any way your software can factor
4 in the possibility of a real wage decrease?
5    A    It can't.
6    Q    Is there any way that you can factor into
7 it the line of work that Ms. Smith would most likely be
8 going into, based on her past training and experience
9 and education?
10    A    No, sir.  That program doesn't have any
11 of those kind of options on it.  It's just strictly a
12 present value calculator.
13    Q    Are you familiar with any software that
14 can perform those kind of calculations?
15    A    No.
16    Q    Now, when you calculate her wages out for
17 29 years, I notice you don't assume she would be making
18 any overtime --
19    A    Yes.
20    Q    -- for the next 29 years.  Is that right?
21    A    Yes.
22    Q    Why did you make that assumption in light
23 of the fact that she did work overtime at SECOR?
24    A    I don't know.  I just took it at just the
25 regular 52-hour week.  I didn't account for overtime,

TULSA COURT REPORTERS
320 South Boston ** Suite 1106
(918) 584-6633

50

1 just to be abundantly fair.
2    Q    Well, I guess I'm asking why didn't you
3 give us the benefit of her overtime for the next 29
4 years when you calculated interim earnings?
5    A    Well, you know, I don't know.  That's a
6 fair question.  And I really couldn't say.  Maybe I
7 should have.  But I've done 100-plus work sheets like
8 this, and normally I don't account for overtime in
9 those future earnings.
10    Q    I notice also that in her next 29 years
11 of employment, you don't factor in the value of any
12 fringe benefits, anything like that.
13    A    No.
14    Q    Any particular reason why you didn't?
15    A    Well, I don't think she got any benefits.
16 I don't think I have that on there.  What she was
17 making at the time she was terminated, she just wasn't
18 getting any benefits.
19    Q    So you've assumed there's no benefits in
20 the future?
21    A    Yeah.
22    Q    Is that right?
23    A    Or in the past, I should say.  Both
24 sides.
25    Q    Well, it's clear that she didn't get

TULSA COURT REPORTERS
320 South Boston ** Suite 1106
(918) 584-6633

51

1 fringes in the past because she was a temporary
2 employee.  But I'm talking about the future now.  You
3 didn't calculate any fringes for the future, and I'm
4 just wondering why you didn't do that.
5    A    I don't know.  But I didn't calculate
6 any.
7    Q    I just wonder what the probability is of
8 someone working for the next 29 years and not getting
9 any fringe benefits.
10    A    I don't know.
11    Q    Or just making minimum wage for the next
12 29 years.  Do you have any idea on what the probability
13 for that is?
14    A    No.
15    Q    Since you prepared these reports, and
16 they were fairly recent, I think, have you received any
17 other information that would have a bearing on the
18 calculations or the conclusions contained in the
19 reports?
20    A    No.
21    MR. HUBER:  David, we just received
22 SECOR's responses to our request for production.  I
23 think I did.
24    MR. STRECKER:  Let's go off the record.
25    (Whereupon, a brief recess was

TULSA COURT REPORTERS
320 South Boston ** Suite 1106
(918) 584-6633

52

1 taken off the record by those present).
2    MR. STRECKER:  While we were off the
3 record, Mr. Huber indicated to me that just today he
4 had received some document production from SECOR to
5 include some payroll records which possibly could cause
6 a change in the calculations in the figures we see on
7 the various exhibits that we've talked about today.
8 And we'll just see -- first of all, did I state
9 accurately our off-the-record discussion?
10    MR. HUBER:  Yes.
11    MR. STRECKER:  And we'll just see if
12 there are any changes.  And I assume if there are any
13 changes, you'll let me know.
14    MR. HUBER:  Yes.
15    MR. STRECKER:  And you can send me
16 revised reports.
17    MR. HUBER:  Yes.
18    Q    (BY MR. STRECKER) Let's look at Number 4
19 now, if we might.  Number 4 is a Loss Projection
20 Schedule for Ms. Prawdzik.  The first difference I note
21 is you're basing annual earnings at SECOR on $8 per
22 hour now.  Is that right?
23    A    Yes.
24    Q    And so that will change the total back
25 lost wages, reducing it slightly from $55.533 to

TULSA COURT REPORTERS
320 South Boston ** Suite 1106
(918) 584-6633

## 49

```
 1     A      I'd say we've had some decreases.
 2 Probably back in the '70s we suffered some of that.
 3     Q      Is there any way your software can factor
 4 in the possibility of a real wage decrease?
 5     A      It can't.
 6     Q      Is there any way that you can factor into
 7 it the line of work that Ms. Smith would most likely be
 8 going into, based on her past training and experience
 9 and education?
10     A      No, sir.  That program doesn't have any
11 of those kind of options on it.  It's just strictly a
12 present value calculator.
13     Q      Are you familiar with any software that
14 can perform those kind of calculations?
15     A      No.
16     Q      Now, when you calculate her wages out for
17 29 years, I notice you don't assume she would be making
18 any overtime --
19     A      Yes.
20     Q      -- for the next 29 years.  Is that right?
21     A      Yes.
22     Q      Why did you make that assumption in light
23 of the fact that she did work overtime at SECOR?
24     A      I don't know.  I just took it at just the
25 regular 52-hour week.  I didn't account for overtime,
```

## 50

```
 1 just to be abundantly fair.
 2     Q      Well, I guess I'm asking why didn't you
 3 give us the benefit of her overtime for the next 29
 4 years when you calculated interim earnings?
 5     A      Well, you know, I don't know.  That's a
 6 fair question.  And I really couldn't say.  Maybe I
 7 should have.  But I've done 100-plus work sheets like
 8 this, and normally I don't account for overtime in
 9 those future earnings.
10     Q      I notice also that in her next 29 years
11 of employment, you don't factor in the value of any
12 fringe benefits, anything like that.
13     A      No.
14     Q      Any particular reason why you didn't?
15     A      Well, I don't think she got any benefits.
16 I don't think I have that on there.  What she was
17 making at the time she was terminated, she just wasn't
18 getting any benefits.
19     Q      So you've assumed there's no benefits in
20 the future?
21     A      Yeah.
22     Q      Is that right?
23     A      Or in the past, I should say.  Both
24 sides.
25     Q      Well, it's clear that she didn't get
```

## 51

```
 1 fringes in the past because she was a temporary
 2 employee.  But I'm talking about the future now.  You
 3 didn't calculate any fringes for the future, and I'm
 4 just wondering why you didn't do that.
 5     A      I don't know.  But I didn't calculate
 6 any.
 7     Q      I just wonder what the probability is of
 8 someone working for the next 29 years and not getting
 9 any fringe benefits.
10     A      I don't know.
11     Q      Or just making minimum wage for the next
12 29 years.  Do you have any idea on what the probability
13 for that is?
14     A      No.
15     Q      Since you prepared these reports, and
16 they were fairly recent, I think, have you received any
17 other information that would have a bearing on the
18 calculations or the conclusions contained in the
19 reports?
20     A      No.
21          MR. HUBER:  David, we just received
22 SECOR's responses to our request for production.  I
23 think I did.
24          MR. STRECKER:  Let's go off the record.
25          (Whereupon, a brief recess was
```

## 52

```
 1 taken off the record by those present).
 2          MR. STRECKER:  While we were off the
 3 record, Mr. Huber indicated to me that just today he
 4 had received some document production from SECOR to
 5 include some payroll records which possibly could cause
 6 a change in the calculations in the figures we see on
 7 the various exhibits that we've talked about today.
 8 And we'll just see -- first of all, did I state
 9 accurately our off-the-record discussion?
10          MR. HUBER:  Yes.
11          MR. STRECKER:  And we'll just see if
12 there are any changes.  And I assume if there are any
13 changes, you'll let me know.
14          MR. HUBER:  Yes.
15          MR. STRECKER:  And you can send me
16 revised reports.
17          MR. HUBER:  Yes.
18     Q      (BY MR. STRECKER)  Let's look at Number 4
19 now, if we might.  Number 4 is a Loss Projection
20 Schedule for Ms. Prawdzik.  The first difference I note
21 is you're basing annual earnings at SECOR on $8 per
22 hour now.  Is that right?
23     A      Yes.
24     Q      And so that will change the total back
25 lost wages, reducing it slightly from $55.533 to
```

53

1 $52,266. Is that correct?
2    A    Yes.
3    Q    Are there any other changes that are not
4 related to the $8 an hour versus $8.50 an hour?
5    A    No. I think that's the only change.
6    Q    Now, on Exhibit 5, the main difference as
7 I see it on 5 is you were not assuming the minimum wage
8 interim earning amount. Is that correct?
9    A    Yes, sir.
10   Q    And is there any particular reason why
11 you prepared this document, since I thought Mr. Huber
12 told you to assume a minimum wage?
13   A    Well, I did this one on my own
14 initiative, Exhibit Number 5, without the minimum wage
15 amount in the back lost wages. And this is the way I
16 normally fill these things out. So I had already done
17 this, faxed it to Mr. Huber and then he said "Could you
18 do me an additional work sheet that would have some
19 minimum wage in the back lost wages period?" And I
20 said "Well, sure".
21   Q    If Ms. Smith went out and got a job that
22 paid $8 an hour, then your calculations would have to
23 be changed. Is that correct?
24   A    Yes.
25   Q    If we were to use Ms. Smith's final wage

54

1 at SECOR, which was $7 an hour, we'd have to change our
2 calculations in that respect, would we not?
3    A    Yes.
4    Q    And you don't have any knowledge or data
5 on how probable it is that Ms. Smith will or will not
6 get a job and what she might be making if she does get
7 a job?
8    A    No.
9    Q    I'm always a little bit curious in these
10 economic damage cases and employment matters, how it
11 can be said that her loss of employment by or at SECOR
12 would cause her to live out the rest of her work life
13 making only $5.15 per hour. Can you enlighten me on
14 that?
15   A    Well, I did a while ago. I believe we've
16 already gone over it. I think that's been asked and
17 answered. But the reason is, I assume that what she
18 was making when she was terminated is not going to
19 change, whether it was $7 or $8 or $8.50 an hour or
20 whatever she was making at termination, I take that for
21 29 years. So when I try to account for something that
22 she's presently making in the work force, I base that
23 upon minimum wage. If they have not entered the work
24 force and they're actually making zero, at a minimum I
25 use minimum wage. I carry that forward for 29 years.

55

1 So it's not really unfair, because I'm doing it both on
2 what she would have, what she was making at SECOR.
3    Q    No, that's not my question at all. In
4 order for SECOR or Morrison Knudson to be liable for
5 her damages, we have to have caused those damages. And
6 I'm asking you how her termination at SECOR caused her
7 to be facing a work life of 29 years with either a
8 minimum wage earnings or no earnings at all. Do you
9 have any insight on that?
10   A    No. I'm sorry, I didn't mean to
11 mischaracterize your question. I guess I misunderstood
12 it.
13   Q    Well, it's just a matter of curiosity
14 with me. This is not a personal injury where she got
15 physically hurt and lost a leg or lost an arm and
16 because of that, her earnings capacity was reduced. I
17 guess my question is, what was it about her
18 termination, to your knowledge, that reduced her
19 earnings capacity to either minimum wage or no wage at
20 all? And I guess your answer is you don't know?
21   A    Right.
22        (Whereupon, Defendant's Exhibit
23 No. 6 and 7 were marked for identification).
24   Q    I think we're ready to look at
25 Mr. Prawdzik's Loss Projection Schedule, which is

56

1 Number 6.
2    A    Okay.
3        MR. HUBER: Can we take a five-minute
4 break?
5        MR. STRECKER: Yes, certainly.
6        (Whereupon, a brief recess was
7 taken off the record by those present).
8    Q    (BY MR. STRECKER) We're ready to talk
9 about Jan Prawdzik now, Exhibit Number 6 and Exhibit
10 Number 7. And the bottom line I see on Prawdzik on
11 Number 6 is a total damage amount of $511,000. Is that
12 correct?
13   A    Yes, sir.
14   Q    And all these figures, I think you've
15 already given me my answers, but just to make sure I'm
16 right, when we look at Prawdzik's work life expectancy
17 based on educational attainment on Exhibit 7, that's
18 something that the software produces based on the data
19 input by you. Is that correct?
20   A    Yes.
21   Q    So all these figures are what the
22 software calculates; nothing is different from what we
23 saw on Jolene's page 2?
24   A    That's right. It's exactly --
25   Q    The same thing?

57

1    A    The exact same thing.
2    Q    Did you look at anything in regard to
3 Mr. Prawdzik that you did not look at with regard to
4 Jolene?
5    A    No.
6    Q    Now, you assume a $70,000 annual salary
7 for Mr. Prawdzik.  Is that correct?
8    A    Yes.
9    Q    And that's what he was making as of the
10 time he left SECOR, I believe?
11    A    That's my understanding.  That's the
12 figure I was provided.
13    Q    Do other experts when they go to
14 calculate future income, do they ever make a
15 calculation of an average wage, say, go back and see
16 what this guy was making over the last five years and
17 average that, rather than taking his highest or last
18 wage?  Do you know?
19    A    I don't know.
20    Q    Now, you have assigned a value of $4,000,
21 looks like $4,800 to company paid benefits.
22    A    Yes.  Line 2 of the work sheet.
23    Q    Can you tell me how you arrived at those
24 figures?
25    A    It's probably an estimate since it's just

58

1 $4,800, but I should have said so parenthetically where
2 that came from.  But no, I can't recall as I look at
3 this who provided me that estimated amount.
4    Q    Well, let's just talk generally now.
5 When you go to estimating the value of company-paid
6 benefits, let's talk about health insurance first.  How
7 do you estimate that?
8    A    Well, if I don't have an exact amount
9 provided by the client, then I just use my own
10 experience on what a family might be paying or a couple
11 for health insurance.  I mean, I've been in this for 20
12 years.  I have a pretty good idea of what insurance
13 premiums cost.  So I just use my own knowledge and
14 experience to come up with, well, would it be $200 or
15 $300 a month.
16    Q    So you're talking about premiums then?
17    A    Yes.  Uh-huh.  What the cost of health
18 insurance would be.  So it's not uncommon at all for me
19 to have to estimate what the health insurance is.
20 Because the only reason it would show up on this work
21 sheet would be if it's being paid by the employer, not
22 the employee.  Because if it's on the employee's pay
23 stub, it's not company-paid.  So then the client has to
24 get that information from the employer, and I guess
25 quite often that's hard to find out, what did the

59

1 insurance cost the company to pay for the benefit of
2 this employee?  And it's hard to get the exact amount
3 and so you end up using an estimate.
4    Q    Now, do you have any information that
5 Mr. Prawdzik went out and had to buy his own health
6 insurance after he left?
7    A    I don't know.  I don't have any
8 information.
9    Q    Because if he didn't, then that wouldn't
10 really be a legitimate item of damage, would it?
11    A    Well, it would be an item of damage:  If
12 the company was paying his health insurance, that would
13 be a form of compensation.
14    Q    But it wasn't paid directly to
15 Mr. Prawdzik, was it?  It was paid to an insurance
16 company?
17    A    Well, it was still a benefit.
18    Q    Right.  But if he didn't have to turn
19 around and basically buy that benefit for himself after
20 his termination, how would that be an item of damage?
21 I don't understand that.
22    A    Well, if a company is paying your --
23 which is common now, a lot of companies, they really
24 load you up on medical benefits now and they pay for
25 prescription medicine and everything else.  And that's

60

1 becoming more common, because you don't have to pay
2 payroll tax and some other costs.  So it is certainly,
3 the trend is to put as much of somebody's annual
4 compensation off of their payroll check.  And so having
5 said that, certainly if an employer is paying for your
6 health insurance, it's part of your compensation.  And
7 irrespective of what Mr. Prawdzik might have done after
8 termination in trying to get insurance or replace
9 insurance, irrespective of that, if it was a benefit
10 the company provided, it would be a form of
11 compensation.
12    Q    I guess your answer would be the same
13 then for life and dental.  Correct?
14    A    Yes.
15    Q    You're not saying that Mr. Prawdzik went
16 out and incurred medical expenses that otherwise would
17 have been covered by health insurance, are you?  That's
18 not a part of your calculations, is it?
19    A    No.
20    Q    Let's talk about the 401-K a little bit.
21 What sort of information did you have about the 401-K
22 plan?
23    A    I don't really recall.  I need to look
24 into that a little deeper.  I don't know.  And I think
25 this entire $4,800 line is probably just a good faith

61

1 estimate to get something in there, at least to get the
2 debate start.
3    Q    You don't know if he's 100 percent vested
4 in the 401-K contributions or anything like that?
5    A    No, sir. And that's something that, as I
6 distill that information in the future, it will be a
7 reason to amend the work sheet.
8    Q    Also I notice in these calculations
9 there's been no accounting for taxes, payroll taxes and
10 that sort of thing. Is that typically the way you
11 perform the calculations?
12   A    Yes.
13   Q    Any particular reason why you do it that
14 way?
15   A    Oh, I think it's just to be fair, I think
16 it really is fair on the side of the defendant, but
17 fair nonetheless because payroll tax is 7.65 percent of
18 a person's self, payroll taxes are paid by an employer.
19 So I mean, if you were to factor it in there somewhere,
20 it would be to the benefit of the plaintiff and to the
21 detriment of the defendant. But in my opinion, it's
22 just better just to leave it off.
23   Q    Well, are you assuming that, let's say
24 Mr. Prawdzik were to get this $511,000, that he would
25 have to pay taxes on it at that time?

62

1    A    Well, is that another question
2 altogether: Is that taxable?
3    Q    Well, are you assuming that he would have
4 to pay taxes on it?
5    A    Well, taxes don't have any bearing on
6 this work sheet at all.
7    Q    I understand. But in your opinion -- and
8 you obviously know something about taxes; I looked at
9 your resume -- would Mr. Prawdzik have to pay taxes on
10 this $511,000, should he receive it?
11   A    Yes.
12   Q    And do you happen to know what his tax
13 bracket is?
14   A    No. But before he calculated his tax, he
15 could subtract his attorney's fees and any other
16 out-of-pocket costs he had. But the net amount that he
17 benefited, it's ordinary income. It's really like
18 getting one big payroll check at one time.
19   Q    You had a category under the
20 post-termination earnings, of C&C Structural, and
21 you've estimated that at $16,000. Is that his current
22 employer?
23   A    No. He's currently working for Davis
24 Surveying, which is the next line down. But in the
25 22-month period were dealing with here since

63

1 termination, he did do some work for C&C Structural.
2    Q    So this $16,000 and the $14,000, those
3 are his earnings in a 22-month period. Correct?
4    A    Yes.
5    Q    Now, when you go down, in the next
6 category, to the current earnings, you use a $15 an
7 hour figure for Mr. Prawdzik.
8    A    Yes, I do.
9    Q    Where do you come up with that $15 per
10 hour?
11   A    I think Mr. Huber, his attorney, informed
12 me that that's what he's presently making in the work
13 force.
14   Q    So that came from Mr. Huber?
15   A    I believe so.
16   Q    Do you know if he's getting any kind of
17 benefits at his current place of employment?
18   A    No, sir, I don't know of any.
19   Q    And you're not projecting any raises or
20 anything like that at Davis?
21   A    Correct: I am not.
22   Q    Just as in the case of Ms. Smith, you
23 projected no fluctuation in income at all?
24   A    That's correct.
25   Q    Do you have any knowledge as to what

64

1 government statistics show someone of Mr. Prawdzik's
2 educational, age and race group, typically make, if
3 it's more or less than $15 per hour?
4    A    I don't know.
5    Q    Now, do these figures assume Mr. Prawdzik
6 is going to remain in the work force -- he's 49 now, I
7 guess -- another 15 years? Is that right?
8    A    Well --
9    Q    13 years?
10   A    Yes, 13.
11   Q    And where do you get that figure from?
12   A    Exhibit 7.
13   Q    Is that the average number of years
14 remaining in the labor force?
15   A    Yes.
16   Q    Or the average number of years until
17 final retirement?
18   A    I think it's, the first one, average
19 number of years remaining until final retirement from
20 the work force.
21   Q    In Ms. Prawdzik's calculations, you used
22 something different, I think -- unless I misunderstood
23 you. I thought in her calculations you used, in coming
24 up with 29 years, you used the number of years
25 remaining until final retirement.

65

1    A      Well, let's see here.  No, I think it's
2 the same one.  Average number of years remaining until
3 final retirement from the labor force.
4    Q      Right.  Which is, there are 28.7 in her
5 case.  So I guess you rounded it up to 29 years.
6 Right?
7    A      Right.
8    Q      And then in Prawdzik's case, you use a
9 13-year figure.  And my question is, is that based on
10 the 12.7?
11    A      Yes, sir.
12    Q      And you just rounded up again?
13    A      Yes, sir.
14    Q      Did you make any special or different
15 assumptions in Mr. Prawdzik's case that you did not
16 make for Ms. Smith?
17    A      No.
18    Q      Do you know if any of the other experts
19 in your field have a different method for calculating
20 future income, --
21    A      No.
22    Q      -- future lost?
23    A      I've never sat in or heard them give
24 deposition testimony or trial testimony.  I've never
25 seen one of their work receipts.

66

1    Q      Never read any publications which
2 discussed different methodology or anything like that?
3    A      No.
4    Q      How long did it take you to do
5 Mr. Prawdzik's calculation?
6    A      Oh, probably half an hour.
7          MR. STRECKER:  I don't believe I have any
8 further questions.  Do you have any questions?
9          MS. RINN:  I don't have any at all.
10          MR. STRECKER:  Do you have any questions?
11          MR. HUBER:  No.
12          MR. STRECKER:  Do you want to read your
13 deposition or do you want to waive your signature?
14          THE WITNESS:  Heck, no, I don't want to
15 read it.
16          (WITNESS EXCUSED)
17          (Signature waived)
18
19
20
21
22
23
24
25

67

1          C E R T I F I C A T E
2
3 STATE OF OKLAHOMA)
                  ) ss.
4 COUNTY OF TULSA  )
5          I, DALENE LAWRENCE, Certified
6 Shorthand Reporter within and for Tulsa County, State
7 of Oklahoma, do hereby certify that the above named
8 witness was by me first duly sworn to testify the
9 truth, the whole truth and nothing but the truth in
10 the case aforesaid, and that I reported in stenograph
11 his deposition; that my stenograph notes were
12 thereafter transcribed and reduced to typewritten form
13 under my supervision, as the same appears herein.
14          I further certify that the foregoing 67
15 pages contain a full, true and correct transcript of
16 the deposition taken at such time and place.
17          I further certify that I am not attorney
18 for or relative to either of said parties, or otherwise
19 interested in the event of said action.
20          WITNESS MY HAND AND SEAL this 30th day of
21 August, 1999.
22
23
24          _____
25          DALENE LAWRENCE, CSR-RPR-CP

FUTURE DAMAGE AND PRESENT VALUE CALCULATOR        DATE: 08/13/99
£££ DATA WRITE-UP, INC. 3150 E. 41ST ST, SUITE 108, TULSA   OK  74105  000

Client Name:  JOLENE PRAWDZIK

Age: 32         Sex (M/F): F       Race (W/B/O): W       Life Expectancy: 48.2
                        Percent of Disability: 100%

Worklife Expectancies

Worklife Expectancy Based on Educational Attainment    21.1

Average Number of Years Remaining Until       Average Number of Remaining Years of
Final Retirement From the Labor Force             Labor Force Participation
            28.7                                          20.6

Calculation of Future Lost Earnings

Enter Interest Rate:  5.2   Enter Annual Earnings: $  13,088   Enter Years: 29

Present Value Amount: $      193,827.64

Worklife duration figures were obtained from the U. S. Department of
Labor, Bureau of Labor Statistics, compiled as of September, 1985;
and material reprinted from "Revised Worklife Tables Reflect 1979-80
Experience", Monthly Labor Review. U. S. Department of Labor, August,
1985, author Shirley J. Smith, Demographic Statistician in the Bureau
of Labor Statistics. Data on average number of years until final
retirement from the labor force have been reprinted from "The Use of
Worklife Tables in Estimates of Lost Earning Capacity", Monthly Labor
Review, U. S. Department of Labor, April, 1983, author David M. Nelson,
Associate Professor of Economics, Western Washington University,
Bellingham, WA 98225. The data were extracted from U. S. Department of
Labor, Bureau of Labor Statistics, as of February, 1985.

EXHIBIT

B1

FUTURE DAMAGE AND PRESENT VALUE CALCULATOR       DATE: 08/13/99
£££ DATA WRITE-UP, INC. 3150 E. 41ST ST, SUITE 108, TULSA  OK  74105 UUU

Client Name:  JOLENE PRAWDZIK

Age: 32        Sex (M/F): F      Race (W/B/O): W        Life Expectancy: 48.2
                        Percent of Disability: 100%

Worklife Expectancies

Worklife Expectancy Based on Educational Attainment    21.1

Average Number of Years Remaining Until          Average Number of Remaining Years of
Final Retirement From the Labor Force                Labor Force Participation
28.7                                          20.6

Calculation of Future Lost Earnings

Enter Interest Rate:  5.2  Enter Annual Earnings: $ 11,688  Enter Years: 29

Present Value Amount: $      173,094.24

Worklife duration figures were obtained from the U. S. Department of Labor, Bureau of Labor Statistics, compiled as of September, 1985; and material reprinted from "Revised Worklife Tables Reflect 1979-80 Experience", Monthly Labor Review, U. S. Department of Labor, August, 1985, author Shirley J. Smith, Demographic Statistician in the Bureau of Labor Statistics. Data on average number of years until final retirement from the labor force have been reprinted from "The Use of Worklife Tables in Estimates of Lost Earning Capacity", Monthly Labor Review, U. S. Department of Labor, April, 1983, author David M. Nelson, Associate Professor of Economics, Western Washington University, Bellingham, WA 98225. The data were extracted from U. S. Department of Labor, Bureau of Labor Statistics, as of February, 1985.

EXHIBIT

tables

B2

*$8.50 --*
*HOUR*

## JOLENE PRAWDZIK
## LOSS PROJECTION SCHEDULE

**BACK LOST WAGES....**

| | |
|---|---|
| ANNUAL EARNINGS AT TERMINATION ($8.50 PER HOUR X 2,080 HOURS) | $17,680.00 |
| AVERAGE MONTHLY OVERTIME (40 HOURS X $12.75 PER HOUR X 12 MONTHS) | $6,120.00 |
| TOTAL ANNUAL COMPENSATION AND BENEFITS | $23,800.00 |

NUMBER OF MONTHS FROM APRIL 1997 THRU JULY 1999 (28)

| | |
|---|---|
| AVERAGE MONTHLY COMPENSATION ($23,800.00 DIVIDED BY 12) | $1,983.33 |
| TIMES NUMBER OF MONTHS | X              28 |
| TOTAL BACK LOST WAGES | $55,533.24 |

LESS POST TERMINATION EARNINGS:

| | |
|---|---|
| OHM (PER CLIENT QUESTIONAIRRE) | ($1,800.00) |
| MINIMUM WAGE FOR 28 MONTHS ($5.15 PER HR. X 173.3) HRS. X 28 MONTHS) | ($24,994.18) |
| NET BACK LOST WAGES | $28,739.06 |

***PRESENT VALUE OF FUTURE LOST EARNINGS......***

| | |
|---|---|
| ANNUAL COMPENSATION AND BENEFITS AT TERMINATION | $23,800.00 |
| LESS CURRENT EARNINGS ($5.15 PER HOUR X 2,080 HOURS) | ($10,712.00) |
| DECREASE IN ANNUAL INCOME SINCE TERMINATION | $13,088.00 |

| | | |
|---|---|---|
| PRESENT VALUE OF | $13,088.00 | @ 5.2% FOR 29 YEARS |
| EQUALS | $193,827.64 | |

TOTAL DAMAGES SUMMARY:

| | |
|---|---|
| TOTAL NET BACK LOST WAGES | $28,739.06 |
| PRESENT VALUE OF FUTURE LOST EARNINGS | $193,827.64 |
| TOTAL DAMAGES | $222,366.70 |

NAME:  JOLENE PRAWDZIK
AGE:  32
DATE OF BIRTH:  1-23-67
EDUCATION:  HIGH SCHOOL DEGREE
RACE:  WHITE
SEX:  FEMALE
INTEREST RATE:  1 YEAR T-BILL RATE AS OF 8-12-99
DATE OF TERMINATION:  4-10-97
EMPLOYER:  SECOR INTERNATIONAL
OCCUPATION:  HAZARDOUS WASTE

*DRAFT*

*Gary Barnes*  8-13-99
GARY BARNES              DATE

BARNES & BARNES, INC.
7030 S. YALE, SUITE 104
TULSA, OK  74136

PRAWDZJO.XLS

EXHIBIT

tables*   B3

### JOLENE PRAWDZIK
### LOSS PROJECTION SCHEDULE

**BACK LOST WAGES....**

| | |
|---|---|
| ANNUAL EARNINGS AT TERMINATION ($8.00 PER HOUR X 2,080 HOURS) | $16,640.00 |
| AVERAGE MONTHLY OVERTIME (40 HOURS X $12 PER HOUR X 12 MONTHS) | $5,760.00 |
| TOTAL ANNUAL COMPENSATION AND BENEFITS | $22,400.00 |
| NUMBER OF MONTHS FROM APRIL 1997 THRU JULY 1999 (28) | |
| AVERAGE MONTHLY COMPENSATION ($22,400.00 DIVIDED BY 12) | $1,866.66 |
| TIMES NUMBER OF MONTHS | X          28 |
| TOTAL BACK LOST WAGES | $52,266.48 |

LESS POST TERMINATION EARNINGS:

| | |
|---|---|
| OHM (PER CLIENT QUESTIONAIRRE) | ($1,800.00) |
| MINIMUM WAGE FOR 28 MONTHS ($5.15 PER HR. X 173.33 HRS. X 28 MONTHS) | ($24,994.18) |
| NET BACK LOST WAGES | $25,472.30 |

**PRESENT VALUE OF FUTURE LOST EARNINGS......**

| | |
|---|---|
| ANNUAL COMPENSATION AND BENEFITS AT TERMINATION | $22,400.00 |
| LESS CURRENT EARNINGS ($5.15 PER HOUR X 2,080 HOURS) | ($10,712.00) |
| DECREASE IN ANNUAL INCOME SINCE TERMINATION | $11,688.00 |

PRESENT VALUE OF        $11,688.00     @ 5.2% FOR 29 YEARS
              EQUALS    $173,094.24

TOTAL DAMAGES SUMMARY:

| | |
|---|---|
| TOTAL NET BACK LOST WAGES | $25,472.30 |
| PRESENT VALUE OF FUTURE LOST EARNINGS | $173,094.24 |
| TOTAL DAMAGES | $198,566.54 |

NAME:  JOLENE PRAWDZIK
AGE:  32
DATE OF BIRTH:  1-23-67
EDUCATION:  HIGH SCHOOL DEGREE
RACE:  WHITE
SEX:  FEMALE
INTEREST RATE:  1 YEAR T-BILL RATE AS OF 8-12-99
DATE OF TERMINATION:  4-10-97
EMPLOYER:  SECOR INTERNATIONAL
OCCUPATION:  HAZARDOUS WASTE

DRAFT

*Gary Barnes*        8-13-99
GARY BARNES        DATE

BARNES & BARNES, INC.
7030 S. YALE, SUITE 104
TULSA, OK  74136

PRAWDZJO.XLS

EXHIBIT
B4

## JOLENE PRAWDZIK
## LOSS PROJECTION SCHEDULE

*BACK LOST WAGES....*

| | |
|---|---|
| ANNUAL EARNINGS AT TERMINATION ($8.00 PER HOUR X 2,080 HOURS) | $16,640.00 |
| AVERAGE MONTHLY OVERTIME (40 HOURS X $12 PER HOUR X 12 MONTHS) | $5,760.00 |
| | |
| TOTAL ANNUAL COMPENSATION AND BENEFITS | $22,400.00 |

NUMBER OF MONTHS FROM APRIL 1997 THRU JULY 1999 (28)

| | |
|---|---|
| AVERAGE MONTHLY COMPENSATION ($22,400.00 DIVIDED BY 12) | $1,866.66 |
| TIMES NUMBER OF MONTHS | X                    28 |
| TOTAL BACK LOST WAGES | $52,266.48 |

LESS POST TERMINATION EARNINGS:

| | |
|---|---|
| OHM (PER CLIENT QUESTIONAIRRE) | ($1,800.00) |
| NET BACK LOST WAGES | $50,466.48 |

*PRESENT VALUE OF FUTURE LOST EARNINGS......*

| | |
|---|---|
| ANNUAL COMPENSATION AND BENEFITS AT TERMINATION | $22,400.00 |
| LESS CURRENT EARNINGS ($5.15 PER HOUR X 2,080 HOURS) | ($10,712.00) |
| | |
| DECREASE IN ANNUAL INCOME SINCE TERMINATION | $11,688.00 |

| | | |
|---|---|---|
| PRESENT VALUE OF | $11,688.00 | @ 5.2% FOR 29 YEARS |
| EQUALS | $173,094.24 | |

TOTAL DAMAGES SUMMARY:

| | |
|---|---|
| TOTAL NET BACK LOST WAGES | $50,466.48 |
| PRESENT VALUE OF FUTURE LOST EARNINGS | $173,094.24 |
| | |
| TOTAL DAMAGES | $223,560.72 |

NAME:  JOLENE PRAWDZIK
AGE:  32
DATE OF BIRTH:  1-23-67
EDUCATION:  HIGH SCHOOL DEGREE
RACE:  WHITE
SEX:  FEMALE
INTEREST RATE:  1 YEAR T-BILL RATE AS OF 8-12-99
DATE OF TERMINATION:  4-10-97
EMPLOYER:  SECOR INTERNATIONAL
OCCUPATION:  HAZARDOUS WASTE

DRAFT

*Gary Barnes*                    8-13-99
GARY BARNES                        DATE

BARNES & BARNES, INC.
7030 S. YALE, SUITE 104
TULSA, OK  74136

PRAWDZIO.XLS

EXHIBIT

BS

**JAN PRAWDZIK**
**LOSS PROJECTION SCHEDULE**

*BACK LOST WAGES...*

| | |
|---|---|
| ANNUAL EARNINGS AT TERMINATION (570,000 ANNUAL SALARY) | $70,000.00 |
| COMPANY PAID BENEFITS (HEALTH, LIFE, DENTAL & 401-K) | $4,800.00 |
| TOTAL ANNUAL COMPENSATION AND BENEFITS | $74,800.00 |

NUMBER OF MONTHS FROM OCTOBER 1997 THRU JULY 1999 (22)

| | |
|---|---|
| AVERAGE MONTHLY COMPENSATION ($74,800.00 DIVIDED BY 12) | $6,233.33 |
| TIMES NUMBER OF MONTHS | x  22 |
| TOTAL BACK LOST WAGES | $137,133.26 |

LESS POST TERMINATION EARNINGS:

| | |
|---|---|
| C & C STRUCTURAL (ESTIMATED) | ($16,000.00) |
| DAVIS SURVEYING (PER 6-30-99 PAYSTUB) | ($14,187.00) |
| NET BACK LOST WAGES | $106,946.26 |

*PRESENT VALUE OF FUTURE LOST EARNINGS......*

| | |
|---|---|
| ANNUAL COMPENSATION AND BENEFITS AT TERMINATION | $74,800.00 |
| LESS CURRENT EARNINGS ($15.00 PER HOUR X 2,080 HOURS) | ($31,200.00) |
| DECREASE IN ANNUAL INCOME SINCE TERMINATION | $43,600.00 |

PRESENT VALUE OF   $43,600.00   @ 5.2% FOR 13 YEARS
EQUALS   $404,672.55

TOTAL DAMAGES SUMMARY:

| | |
|---|---|
| TOTAL NET BACK LOST WAGES | $106,946.26 |
| PRESENT VALUE OF FUTURE LOST EARNINGS | $404,672.55 |
| TOTAL DAMAGES | $511,618.81 |

NAME:  JAN PRAWDZIK
AGE:  49
DATE OF BIRTH:  12-27-49
EDUCATION:  BACHELORS DEGREE
RACE:  WHITE
SEX:  MALE
INTEREST RATE:  1 YEAR T-BILL RATE AS OF 8-12-99
DATE OF TERMINATION:  10-20-97
EMPLOYER:  SECOR INTERNATIONAL
OCCUPATION:  PROJECT SUPERINTENDENT

1st DRAFT

GARY BARNES                    DATE   8-16-99

BARNES & BARNES, INC.
7030 S. YALE, SUITE 104
TULSA, OK  74136

PRAWDZJA.XLS

**EXHIBIT**
B6

*Resume*

**Gary Barnes**
**7030 S. Yale - Suite 104**
**Tulsa, Oklahoma  74136**

**Age:**        **Forty Nine**
**Phone:**      **918-492-2993**
**Education:**  **B.S. Degree, Major in Accounting**
               **(Minors in Business & Economics)**
               **Graduated 5-16-72**
               **Northeastern State University**
               **Tahlequah, Oklahoma**

## Employment History

    **1983-1999**   **Barnes & Barnes, Inc.**
    **1972-1983**   **Various Corporate Accounting Positions with Tulsa Companies**

## Professional Experience

Over twenty five years experience in the field of accounting, financial consulting and tax work.  Have prepared tax returns consisting of corporate, partnership, fiduciary, individual,  and various other federal and state tax returns. Have represented clients in the following matters:  corporate and individual IRS audits, criminal investigations, wage & hour audits, DOL investigations, etc.

Presently have about 50 Tulsa corporations on monthly retainer for accounting and tax work.  Responsible for their monthly financial statements, credit lines and loan applications, tax preparation, business evaluation and financial consulting, insurance review, workers' comp audits, etc.  Am on a first name basis with many officials with the IRS and Oklahoma Tax Commission.

Have prepared lost income calculations , including computation of lost future earnings discounted to present value, in over 150 wrongful termination cases.  In addition to preparing the calculation, I have provided both deposition and trial testimony on this subject.

Have worked extensively with several panel trustees regarding companies in bankruptcy.  This involves conducting business evaluations, preparing  fiduciary tax returns, review and analysis of books and records,  identifying and analyzing preferences and fraudulent conveyances, etc.  Have appeared numerous times as an expert witness before State and Federal Courts.

Have served as Personal Representative/Administrator, Executor, Receiver, and Guardian for  the Tulsa County District Court.  Have been retained by FDIC for accounting and financial work regarding several companies and individuals in bankruptcy.  Previously served as a  Trustee for a six million dollar estate in Chapter 11 in the Eastern District of Oklahoma.

_____          _____
**Gary Barnes**                              **Date**

**EXHIBIT**

_B8_

08/17/1999  14:02   19184936373          BARNES & BARNES, INC          PAGE-.02

FUTURE DAMAGE AND PRESENT VALUE CALCULATOR      DATE: 08/13/99
£££ DATA WRITE-UP, INC. 3150 E. 41ST ST, SUITE 108, TULSA  OK  74105 OOU

Client Name:  JAN PRAWDZIK

Age: 49        Sex (M/F): M      Race (W/B/O): W        Life Expectancy: 26.9
                       Percent of Disability: 100%

Worklife Expectancies

Worklife Expectancy Based on Educational Attainment    15.4

Average Number of Years Remaining Until        Average Number of Remaining Years of
Final Retirement From the Labor Force                  Labor Force Participation
                12.7                                            13.4

---

Calculation of Future Lost Earnings

Enter Interest Rate:  5.2   Enter Annual Earnings: $  43,600   Enter Years: 13

Present Value Amount: $      404,672.55

Worklife duration figures were obtained from the U. S. Department of
Labor, Bureau of Labor Statistics, compiled as of September, 1985;
and material reprinted from "Revised Worklife Tables Reflect 1979-80
Experience", Monthly Labor Review, U. S. Department of Labor, August,
1985, author Shirley J. Smith, Demographic Statistician in the Bureau
of Labor Statistics. Data on average number of years until final
retirement from the labor force have been reprinted from "The Use of
Worklife Tables in Estimates of Lost Earning Capacity", Monthly Labor
Review, U. S. Department of Labor, April, 1983, author David M. Nelson,
Associate Professor of Economics, Western Washington University,
Bellingham, WA 98225. The data were extracted from U. S. Department of
Labor, Bureau of Labor Statistics, as of February, 1985.

EXHIBIT

B7